**Kathy DUNAGIN, et al.,**
**Plaintiffs-Appellants,**

v.

**The CITY OF OXFORD, MISSISSIPPI,**
**et al., Defendants-Appellees,**

**The State of Mississippi,**
**Intervenor-Appellee.**

**LAMAR OUTDOOR ADVERTISING,**
**INC., et al., Plaintiffs-Appellees,**

v.

**MISSISSIPPI STATE TAX COMMIS-**
**SION, et al., Defendants-Appellants.**

Nos. 80–3762, 82–4076.

United States Court of Appeals,
Fifth Circuit.

Oct. 31, 1983.

burg, Miss., for Lamar Outdoor Advertising, et al. in both cases.

Richard D. Gamblin, Hattiesburg, Miss., for plaintiffs-appellees in No. 82–4076.

John E. Milner, W. Timothy Jones, Edmund L. Brunini, Sr., Sp. Asst. Attys. Gen., Peter M. Stockett, Jr., Asst. Atty. Gen., Jackson, Miss., for State of Miss. in No. 80–3762 and for defendants-appellants in No. 82–4076.

William S. Boyd, III, Sp. Asst. Atty. Gen., Jackson, Miss., for State of Miss. in No. 80–3762.

Gary W. Gardenhire, Asst. Atty. Gen., Chief, Civ. Div., Oklahoma City, Okl., for State of Okl. in both cases.

F. Edwin Perry, Oxford, Miss., for City of Oxford, in No. 80–3762.

Bruce Silverglade, Washington, D.C., amicus curiae for Center for Science in the Public Interest.

Peter H. Meyers, John F. Banzhaf, III, Washington, D.C., amicus curiae for Accuracy and Action about Alcohol Addiction.

Before CLARK, Chief Judge, BROWN, GOLDBERG, GEE, REAVLEY, POLITZ, RANDALL, TATE, JOHNSON, WILLIAMS, GARWOOD, JOLLY and HIGGINBOTHAM, Circuit Judges.*

Holcomb, Dunbar, Connell, Merkel, Tollison & Khayat, Dan W. Webb, Grady F. Tollison, Jr., Guy T. Gillespie, III, Oxford, Miss., for plaintiffs-appellants in No. 80–3762.

James K. Child, Jr., Jackson, Miss., Henry E. Chatham, Jr., Jack H. Pittman, Hatties-

REAVLEY, Circuit Judge:

Mississippi is one of several states which significantly restrict liquor advertising by the local media.[1] Two suits were filed attacking, principally on First Amendment grounds, the Mississippi law. The District Courts for the Northern and Southern Dis-

---

* Judge Alvin B. Rubin recused himself and did not participate in this decision.

1. *See* Fla.Stat.Ann. § 561.42(10)–(12) (West Supp.1983); Mass.Gen.Laws Ann. ch. 138, § 24 (West 1974); Utah Code Ann. §§ 32–7–26 to 28 (1953 & Supp.1981); Okla. Const. art. XXVII, § 5 and Okla.Stat.Ann. tit. 37, § 516 (West Supp.1982).

tricts of Mississippi reached opposite judgments in those cases. *Dunagin v. City of Oxford,* 489 F.Supp. 763 (N.D.Miss.1980) (upholding); *Lamar Outdoor Advertising, Inc. v. Mississippi State Tax Commission,* 539 F.Supp. 817 (S.D.Miss.1982) (invalidating).[2] We uphold the constitutionality of the Mississippi law.

## I. The Mississippi Law

Until 1966 the possession and sale of alcohol were banned in Mississippi. The state then accepted the impossibility of enforcement of total prohibition and enacted a local option law, allowing each county or judicial district therein to vote an end to the prohibition that otherwise continues throughout the state. Miss.Code Ann. §§ 67-1-1 *et seq.* (1973). Mississippi did not drop its objection to intoxicants by enacting the 1966 law; it reannounced the state policy of prohibition while allowing local exceptions under strict regulation:

> The policy of this state is reannounced in favor of prohibition of the manufacture, sale, distribution, possession and transportation of intoxicating liquor ....

The purpose and intent of this chapter is to vigorously enforce the prohibition laws throughout the state, except in those counties voting themselves out from under the prohibition law in accordance with the provisions of this chapter, and, in those counties, to require strict regulation and supervision of the manufacture, sale, distribution, possession and transportation of intoxicating liquor....

*Id.* § 67-1-3. At the time of trial in *Lamar Outdoor Advertising,* thirty-five counties and four judicial districts remained "dry," while forty-three counties and four judicial districts had voted to legalize liquor. The wet and dry counties are spread across the state in a checkerboard pattern, with the majority of the population residing in wet counties.

Pursuant to its rulemaking authority granted by the local option law, *id.* § 67-1-37(e), the Mississippi State Tax Commission promulgated Regulation No. 6, which prohibits most advertisements that "originate" within the state.[3] The plaintiffs challenged

---

**2.** A panel of this court heard the consolidated appeal and decided the law was unconstitutional. Before delivery of that opinion, however, the 10th Circuit upheld the Oklahoma law in *Oklahoma Telecasters Ass'n v. Crisp,* 699 F.2d 490 (10th Cir.1983), *cert. granted sub nom. Capital City Cables, Inc. v. Crisp,* —— U.S. ——, 104 S.Ct. 66, 78 L.Ed.2d 81 (1983). Under the procedure of this circuit governing when a panel proposes to issue a decision that initiates a conflict with another circuit, the proposed opinion was first circulated to all active judges of this court. An en banc poll was requested, and the case was voted en banc. The panel opinion was then published, though vacated: 701 F.2d 314, 335.

**3.** The regulation provides:

No person, firm or corporation shall originate advertisement in this State, dealing with alcoholic beverages by any means whatsoever, including but not limited to newspapers, radio, television, circular, dodger, word of mouth, signs, billboards, displays or any other advertising media, except as follows:

(1) On the front of any licensed retail package store building, and no higher than the top of the roof of the permitted place of business at its highest point, there may be printed without illumination, in letters not more than eight (8) inches high, the name of the business, the permit number thereof, which may

be preceded by the words "A.B.C. Permit No. _____", and the words "Package Liquor Sold Here". Where the package retail store is located in a building of more than one story in height, the top of such sign shall not be higher than the top of the first story.

(2) A package retail permittee may advertise merchandise inside the permitted place of business by means of a display or displays, signs or placards, or notices, without special illumination. No displays, signs, placards or notices will be permitted in windows. No displays, signs, placards, notices, shelves, counters, or other fixtures shall be constructed or arranged in such a manner as to attract attention from outside the building.

(3) The holder of an on-premises retailer's permit may use the word "lounge", or other similar words descriptive of the facilities available at the permittee's principal place of business, in letters not more than eight (8) inches high and without special illumination, on signs located on the permittee's premises. The use of the word "lounge", but no other words of a similar nature, will be permitted on billboards in letters not more than eight (8) inches high.

(4) In other advertising media, an on-premises permittee may use the word "lounge", but no other words of a similar nature, including, specifically, but not limited to "cocktails", "bar", and "happy hour". The word

this regulation, as well as Miss.Code Ann. § 67–1–85 (1973) which prohibits most forms of liquor sign advertising as well.[4]

The combined effect of Regulation No. 6 and section 67–1–85 is that there are no billboards advertising hard liquor or wine in Mississippi. Local newspapers printed and distributed within the state are similarly restricted. Radio and television stations operating within the state cannot carry wine commercials, and must delete such advertisements from incoming network programming.

There are some exceptions to this ban upon the advertising of alcoholic beverages. Beer advertisements are generally allowed in all media.[5] A retail package store is allowed under Regulation No. 6 to erect on-site signs with the message "Package Liquor Sold Here" along with its permit number, and may advertise inside the premises. Bars and restaurants can use the word "lounge" on signs and in other media.

The state has interpreted its law to mean that advertisements must originate within the state to be subject to its regulation. Hence, television and radio stations in other states broadcast liquor commercials that reach in-state viewers and listeners. Newspapers and magazines containing liquor advertisements from other states are mailed into the state, and newsstands in Mississippi are allowed to sell such publications. The state has even taken the position that a publication printed in Mississippi but mailed for distribution in Mississippi from another state is not subject to regulation. The state has also interpreted federal regulations to prohibit it from interrupting or deleting wine commercials in cable television transmissions sent from outside the state. *See* 47 C.F.R. § 76.55 (1982).

## II. The First Amendment and Liquor Regulation

Those challenging the advertising ban argue primarily that it violates the First Amendment. They contend that this ad-

---

"lounge" must be subordinated by restaurants to advertising placed for the other facilities offered at the place of business.

(5) All advertising not specifically permitted by statute or regulation is prohibited. Advertising of any type whatsoever about which a permittee may be in doubt should be submitted to the State Tax Commission for approval.

**4.** The statute provided:

No holder of a package retailer's permit shall have any sign, lighted or otherwise, or printing upon the outside of the premises covered by his permit advertising, announcing or advising of the sale of alcoholic beverages in or on said premises. However, on the front of said premises there may be printed, in letters not more than eight (8) inches high, the name of the business, the permit number thereof, which may be preceded by the words "A.B.C. Permit No." and the words "Package Liquors Sold Here." In addition, no alcoholic beverages, price list or promotional matter shall be kept, stored or displayed in the windows or other openings of said premises. An open window space or spaces not exceeding sixty square feet in area in the aggregate, and an open space of not exceeding twenty square feet in a front door, may be left open to view. The commission shall have the power and authority to adopt and enforce reasonable rules and regulations to compel compliance with the provisions of this section.

It shall be unlawful to advertise alcoholic beverages by means of signs, billboards, or displays on or along any road, highway, street, or building.

This section shall not be construed so as to prohibit the commission from promulgating rules and regulations permitting the holder of an on-premises retailer's permit to include in signs located on the holder's premises and in advertisements of the holder's principal business, the word "lounge" or other similar words descriptive of the facilities available at such principal place of business, without referring specifically to alcoholic beverages. Another statute banning liquor advertisements, Miss.Code Ann. § 97–31–1 (1972), is limited in scope to the provisions of the 1966 local option law, as explained in the panel opinion. 701 F.2d at 317.

**5.** As the district court in *Dunagin* explained, section 97–31–1 was amended in 1934 to allow such advertisements. 489 F.Supp. at 767 n. 4. While only light beer and wines of less than four percent alcohol by weight are expressly exempted from regulation, *see* sections 67–1–5(a), 67–3–5, the record indicates that brand name beer is generally advertised in Mississippi. Native wines can also now be advertised on billboards, except as to price, under an express exception in section 67–1–85. This exception became effective in July 1982, after the district court decisions in this case, and does not color our analysis today.

vertising falls within that limited protection afforded pure commercial speech which does "no more than propose a commercial transaction," *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.,* 425 U.S. 748, 762, 96 S.Ct. 1817, 1825, 48 L.Ed.2d 346 (1976) and which is "related solely to the economic interests of the speaker and its audience," *Central Hudson Gas & Electric Corp. v. Public Service Commission of New York,* 447 U.S. 557, 561, 100 S.Ct. 2343, 2348, 65 L.Ed.2d 341 (1980).[6]

### A. The Scope of Commercial Speech Protection

While we need not so hold, there may be no First Amendment protection of purely commercial advertising of those products which the state could entirely proscribe.[7] Or, if by virtue of its police power the state may prohibit or severely limit a trade or conduct (e.g., prostitution, hand-guns, explosive devices, marijuana, pipes and paraphernalia designed to be used with illegal drugs), the state may be entitled to allow the trade but restrict the advertising without having to justify the restriction by balancing the state interest against the public interest in the commercial speech. The Court has not expressly excepted this category of advertising from commercial speech protection. It has excluded advertising of illegal activity from the protection. *Pittsburgh Press Co. v. Pittsburgh Commission on Human Relations,* 413 U.S. 376, 388–389, 93 S.Ct. 2553, 2560, 37 L.Ed.2d 669 (1973). And restrictions on false, deceptive, and misleading commercial speech are permissible. *Friedman v. Rogers,* 440 U.S. 1, 9, 99 S.Ct. 887, 893, 59 L.Ed.2d 100 (1979). Thus far, the Court has written to place commercial speech under protection where "it at least concern[s] lawful activity and [is] not . . . misleading." *Central Hudson Gas,* 447 U.S. at 566, 100 S.Ct. at 2351.

The Court may or may not choose to exclude from protection the truthful advertising of lawful trades or activities which the state has so great an interest in abating that they are subject to prohibition. It probably makes no difference, however, whether this category of advertising is treated as outside of commercial speech protection or whether the *Central Hudson Gas* four-part test, discussed below, is applied, because cases of this category likely present state interests which justify advertising restrictions that pass the latter test as a matter of law.

The state argues that liquor advertising is excluded from protection by the previous opinions of the Supreme Court because that advertising does promote illegal activity and is inherently misleading. We do not agree with these contentions.

The illegality argument is based on the fact that nearly half of the counties in the state are dry, and the fact that even in the wet counties, the manufacture, sale and distribution of liquor are only legal in limited areas—municipalities, qualified resort areas and clubs, Miss.Code Ann. § 67–1–7 (1973) —and even consumption is banned in certain areas of wet counties, such as public schools and colleges, *id.* § 67–1–37(g). The state reasons that liquor advertising would therefore necessarily relate to unlawful activity. The district court in *Dunigan* agreed:

> The Local Option Law does not expressly forbid the advertising of alcoholic beverages in "dry" areas, but it is beyond peradventure that such advertising must contribute to and encourage violation of the statute. This is true whether or not the newspaper is circulated only in a "dry" county because advertisement of liquor is apt to encourage consumers in "dry" counties to violate the law by purchasing liquor in "wet" counties for

---

**6.** For a thoughtful discussion of the commercial speech doctrine, *see* Jackson & Jeffries, *Commercial Speech: Economic Due Process and the First Amendment,* 65 Va.L.Rev. 1 (1979).

**7.** Justice Blackmun, however, has stated that "I seriously doubt whether suppression of infor-

mation concerning the availability and price of a legally offered product is ever a permissible way for the State to 'dampen' demand for or use of the product." *Central Hudson Gas, supra,* 447 U.S. at 574, 100 S.Ct. at 2355 (concurring).

transportation home. This factor is exacerbated in the case of *The Daily Mississippian* because its principal readers are University students, particularly mobile citizens who come to Oxford from all sections of Mississippi to attend school. Some students doubtless purchase liquor in Oxford to take with them when they return home or visit with friends or relatives in "dry" counties.

Because liquor advertising promotes activity illegal in a substantial portion of Mississippi, we hold that the State may regulate *The Daily Mississippian's* advertising of it even to the point of an absolute ban.

489 F.Supp. at 771.

If Mississippi cannot prohibit advertising because of the general effect upon liquor consumption, the state will not be entitled to prohibit advertising simply because it might stimulate the thirst of a consumer to the point where he elects to violate the local option law. The Mississippi laws under attack prohibit the advertisement of what may be done lawfully in Mississippi; those laws do not forbid the advertiser's promotion of violation of Mississippi law. The commercial speech doctrine would disappear if its protection ceased whenever the advertised product might be used illegally. Peanut butter advertising cannot be banned just because someone might someday throw a jar at the presidential motorcade.

The state then argues that liquor advertising is not protected because it is misleading: falsely identifying alcohol with "the good life" instead of disclosing the personal and social disasters it threatens, and particularly affecting the young and unsophisticated children in the public audience.

Again, if Mississippi cannot prohibit this advertising because of the strength of the state interest against liquor consumption, the state will have little success in preventing the advertising merely because it fails to tell the whole truth about its product. Nearly all advertising associates the promoted product with a positive or alluring lifestyle or famous or beautiful people. Our policy is to leave it to the public to cope for themselves with Madison Avenue panache and hard sells. A central teaching of the commercial speech doctrine was summed up in *Central Hudson Gas:*

> In applying the First Amendment to this area, we have rejected the "highly paternalistic" view that government has complete power to suppress or regulate commercial speech. "[P]eople will perceive their own best interests if only they are well enough informed, and ... the best means to that end is to open the channels of communication rather than to close them ...." Even when advertising communicates only an incomplete version of the relevant facts, the First Amendment presumes that some accurate information is better than no information at all.

447 U.S. at 562, 100 S.Ct. at 2349 (citations omitted).

As for the argument that the advertising will reach young children, "the government may not 'reduce the adult population ... to reading only what is fit for children.' " *Bolger v. Youngs Drug Products Corp.,* —— U.S. ——, ——, 103 S.Ct. 2875, 2884, 77 L.Ed.2d 469 (1983) (quoting *Butler v. Michigan,* 352 U.S. 380, 383, 77 S.Ct. 524, 525, 1 L.Ed.2d 412 (1957)).

### B. The Twenty-first Amendment

If there is any instance where a state can escape First Amendment constraint while prohibiting truthful advertising promoting lawful sales, it would be where the product being sold is intoxicating liquor. Section two of the Twenty-first Amendment states:

> The transportation or importation into any state, territory, or possession of the United States for delivery or use therein of intoxicating liquors, in violation of the laws thereof, is hereby prohibited.

This clause serves primarily to create an exception to the normal operation of the Commerce Clause. *Craig v. Boren,* 429 U.S. 190, 206, 97 S.Ct. 451, 461, 50 L.Ed.2d 397 (1976). Its effect goes much further and is very significant to the case before us.

In *Castlewood International Corp. v. Simon,* 596 F.2d 638, 642 (5th Cir.1979), *vacated and remanded,* 446 U.S. 949, 100 S.Ct. 2914, 64 L.Ed.2d 806 (1980), *panel opinion reinstated,* 626 F.2d 1200 (5th Cir.1980), we explained that section two of the Twenty-first Amendment:

is unique in the constitutional scheme in that it represents the only express grant of power to the states, thereby creating a fundamental restructuring of the constitutional scheme as it relates to one product—intoxicating liquors. *See California v. LaRue,* 409 U.S. 109, 115, 93 S.Ct. 390 [395], 34 L.Ed.2d 342 (1972).

There can be no doubt that this was the desire of those who framed the Twenty-first Amendment. As originally proposed, the Amendment contained three substantive sections, the third of which provided:

Congress shall have concurrent power to regulate or prohibit the sale of intoxicating liquors to be drunk on the premises where sold.

76 Cong.Rec. 4138 (1933). Section Three was deleted because of Congressional concern that its grant of concurrent power to regulate liquor to Congress would be construed to support the supremacy of federal regulation of liquor sales. As Senator Wagner pointed out, "We have expelled the system of national control through the front door ... and readmitted it forthwith through the back door of Section 3." 76 Cong.Rec. 4145 (1933). This would have been the "ironical result of an amendment designed to restore to the states control of their liquor problem." *Id.* With these concerns in mind, Section Three was deleted in the final version of the amendment.

Thus, any analysis of the validity of a state statute regulating liquor does not proceed via the traditional route for testing the constitutionality of state statutes. We must proceed from a vantage point of presumed state power and then ask whether there are any limitations to that power, always keeping in mind that where intoxicating liquors are concerned, great deference must be accorded a comprehensive state regulatory scheme.

Clearly, state liquor laws are not immune from constitutional scrutiny. The Supreme Court has struck down such laws found in violation of the Establishment Clause, *Larkin v. Grendel's Den, Inc.,* —— U.S. ——, 103 S.Ct. 505, 74 L.Ed.2d 297 (1982), federal antitrust laws passed under the Commerce Clause, *California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.,* 445 U.S. 97, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980), the Equal Protection Clause of the Fourteenth Amendment, *Craig v. Boren, supra,* federal procedural due process requirements, *Wisconsin v. Constantineau,* 400 U.S. 433, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971), and the Export-Import Clause, *Department of Revenue v. James B. Bean Distilling Co.,* 377 U.S. 341, 84 S.Ct. 1247, 12 L.Ed.2d 362 (1964). Nevertheless, the Supreme Court has twice, in examining the interface of the First and Twenty-first Amendments, given an unusual amount of deference to state liquor regulations.

In *California v. LaRue,* 409 U.S. 109, 93 S.Ct. 390, 34 L.Ed.2d 342 (1972), the plaintiffs challenged a California regulation banning nudity, and live performances, films and pictures depicting certain actual and simulated sexual acts, in nightclubs and bars where alcoholic beverages were sold. The Supreme Court did "not disagree with the District Court's determination that these regulations on their face would proscribe some forms of visual presentation that would not be found obscene" under *Roth v. United States,* 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957) and later cases. 409 U.S. at 116, 93 S.Ct. at 395. The Court held, however, that the normal analyses of obscenity under *Roth* and communicative conduct under *United States v. O'Brien,* 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968) did not apply because of the added consideration of the Twenty-first Amendment. It found that "the broad sweep of the Twenty-first Amendment has been recognized as conferring *something* more than the normal state authority over public health, welfare, and morals," 409 U.S. at 114, 93 S.Ct. at 395, and that "the case for

upholding state regulation in the area of the Twenty-first Amendment is *undoubtedly strengthened* by that enactment," *id.* at 115, 93 S.Ct. at 395 (emphasis added). The Court found that the state's conclusions as to the need for the regulations were not "irrational," or "unreasonable," and that "wide latitude as to the choice of means to accomplish a permissible end must be accorded the state agency that is itself the repository of the State's power under the Twenty-first Amendment." *Id.* at 116, 93 S.Ct. at 395. The opinion of the Court concludes with the following passage:

> The Department's conclusion, embodied in these regulations, that certain sexual performances and the dispensation of liquor by the drink ought not to occur at premises that have licenses was not an irrational one. Given the added presumption in favor of the validity of the state regulation in this area that the Twenty-first Amendment requires, we cannot hold that the regulations on their face violate the Federal Constitution.

*Id.* at 118–19, 93 S.Ct. at 397.

In *New York State Liquor Authority v. Bellanca,* 452 U.S. 714, 101 S.Ct. 2599, 69 L.Ed.2d 357 (1981), the Court upheld a state ban on topless dancing in liquor establishments. Notably, *Bellanca* was decided after *Central Hudson Gas* and *Craig v. Boren.* Despite arguments that the acts in question did not partake of gross sexuality as in *LaRue* and that there was "no legislative finding that topless dancing poses anywhere near the problem posed by acts of 'gross sexuality,'" 452 U.S. at 717, 101 S.Ct. at 2601, the Court upheld the regulation, concluding that:

> [T]he elected representatives of the State of New York have chosen to avoid the disturbances associated with mixing alcohol and nude dancing by means of a reasonable restriction upon establishments which sell liquor for on-premises consumption. Given the "added presumption in favor of the validity of the state regulation" conferred by the Twenty-first Amendment, *California v. LaRue,* 409 U.S., at 118, 93 S.Ct., at 397, we cannot agree with the New York Court of Appeals that the statute violates the United States Constitution. Whatever artistic or communicative value may attach to topless dancing is overcome by the State's exercise of its broad powers arising under the Twenty-first Amendment. Although some may quarrel with the wisdom of such legislation and may consider topless dancing a harmless diversion, the Twenty-first Amendment makes that a policy judgment for the state legislature, not the courts.

*Id.* at 718, 101 S.Ct. at 2601.

The test applied in *LaRue* and *Bellanca* is less strict than that applied in *Central Hudson Gas.* First, the former test employs a rational basis scrutiny, requiring only a reasonable or rational means of reaching a permissible end, as opposed to a higher level of scrutiny imposed by the latter test. Second, *LaRue* and *Bellanca* employ a presumption in favor of validity, while ordinarily the burden is on the party defending a restriction on speech, even in a commercial speech case. *See Bolger v. Youngs Drug Products Corp.,* —— U.S. ——, —— n. 20, 103 S.Ct. 2875, 2882 n. 20, 77 L.Ed.2d 469 (1983). *LaRue* and *Bellanca* are cases where fully protected speech was constitutionally restricted because the restriction was incidental to the rational regulation of liquor. It may follow that because any restriction on the advertisement of liquor itself is necessarily related, rationally and directly, to liquor regulation, restrictions placed upon that advertisement by the states are consistent with the First Amendment.

### C. *Queensgate* and *Capital Broadcasting*

The state argues that two rulings by the Supreme Court have precedential effect here. The first is *Queensgate Investment Co. v. Liquor Control Commission,* 69 Ohio St.2d 361, 433 N.E.2d 138, *appeal dismissed,* —— U.S. ——, 103 S.Ct. 31, 74 L.Ed.2d 45 (1982). That case involved a First Amendment challenge to an Ohio regulation that generally permitted liquor advertising, but required that liquor permit holders "not

advertise the price per bottle or drink of any alcoholic beverage, or in any manner refer to price or price advantage except within their premises and in a manner not visible from the outside of said premises." 433 N.E.2d at 139 n. 1. The regulation was upheld by the Ohio Supreme Court, and an appeal was taken to the United States Supreme Court, the jurisdictional statement questioning whether the regulation violated the First Amendment. Mississippi argues that the summary dismissal for want of a substantial federal question by the Supreme Court in *Queensgate* binds us in this case.

The Supreme Court has declared that while summary dispositions of appeals are decisions on the merits that bind lower federal courts, such decisions extend only to "the precise issues presented and necessarily decided by those actions." *Mandel v. Bradley*, 432 U.S. 173, 176, 97 S.Ct. 2238, 2240, 53 L.Ed.2d 199 (1977). *Queensgate* did not involve the precise issues presented here, since the Ohio regulation was more narrowly drawn than the Mississippi regulation. The Ohio statute only banned certain price advertisements and might be viewed as a "time, place and manner" restriction, unlike the Mississippi regulation.

Nevertheless, we agree with the Tenth Circuit, which when recently examining Oklahoma's liquor advertising ban, noted that "*Queensgate* manifestly presented an issue concerning the tension between the First and Twenty-first Amendments." *Oklahoma Telecasters Ass'n v. Crisp*, 699 F.2d 490, 497 (10th Cir.1983), *cert. granted sub nom. Capital Cities Cable, Inc. v. Crisp*, —— U.S. ——, 104 S.Ct. 66, 78 L.Ed.2d 81 (1983). We also agree with the state that the price advertising at issue in *Queensgate* lies near the center of the commercial speech doctrine and is probably as likely to deserve commercial speech protection as the "lifestyle" advertisements that the state alleges the plaintiffs in this case are interested in displaying. *See Bates v. State Bar of Arizona*, 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977) (upholding lawyer price advertising); *Virginia State Board of Pharmacy v. Virginia Citizens*

*Consumer Council, Inc.*, 425 U.S. 748, 761, 96 S.Ct. 1817, 1825, 48 L.Ed.2d 346 (1976) (upholding drug prescription price advertising and noting that "[t]he 'idea' he wishes to communicate is simply this: 'I will sell you the X prescription drug at the Y price.' ")

We take a middle road on this issue, following the approach taken in *Crisp, supra,* and *Plante v. Gonzalez*, 575 F.2d 1119 (5th Cir.1978), *cert. denied*, 439 U.S. 1129, 99 S.Ct. 1047, 59 L.Ed.2d 90 (1979). While the summary dismissal by the Supreme Court in *Queensgate* must "caution us" against finding the Mississippi regulations unconstitutional, *Plante*, 575 F.2d at 1125–26, we nevertheless are not relieved of our duty "to undertake an independent examination of the merits." *Mandel v. Bradley, supra*, 432 U.S. at 177, 97 S.Ct. at 2241.

The state and amicus parties also argue that the Supreme Court's summary affirmance in *Capital Broadcasting Co. v. Mitchell*, 333 F.Supp. 582 (D.D.C.1971) (three-judge court), *aff'd mem.*, 405 U.S. 1000, 92 S.Ct. 1289, 31 L.Ed.2d 472 (1972), operates as compelling authority in this case. The decision, upholding a federal ban on broadcasting of cigarette commercials, is of limited precedential value for two reasons. First, *Capital Broadcasting* antedated the emergence of the commercial speech doctrine in the mid-1970's, and was based on the view that commercial speech was completely outside the protection of the First Amendment. Second, the Supreme Court has itself expressly limited *Capital Broadcasting* to "the special problems of the electronic broadcast media," *Virginia Board of Pharmacy, supra*, 425 U.S. at 773, 96 S.Ct. at 1831, that make that form of communication " 'especially subject to regulation in the public interest,' " *Bigelow v. Virginia*, 421 U.S. 809, 825 n. 10, 95 S.Ct. 2222, 2234 n. 10, 44 L.Ed.2d 600 (quoting *Capital Broadcasting*, 333 F.Supp. at 584).

### III. The *Central Hudson Gas* Test

We base our decision, ultimately, upon the application of the Supreme Court's analysis in *Central Hudson Gas & Electric*

*Corp. v. Public Service Commission of New York,* 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980):

> In commercial speech cases, then, a four-part analysis has developed. At the outset, we must determine whether the expression is protected by the First Amendment. For commercial speech to come within that provision, it at least must concern lawful activity and not be misleading. Next, we ask whether the asserted governmental interest is substantial. If both inquiries yield positive answers, we must determine whether the regulation directly advances the governmental interest asserted, and whether it is not more extensive than is necessary to serve that interest.

*Id.* at 566, 100 S.Ct. at 2351.

In *Bolger v. Youngs Drug Products Corp.,* —— U.S. ——, 103 S.Ct. 2875, 77 L.Ed.2d 469 (1983), the latest Supreme Court commercial speech case at this writing, the Court reaffirmed the *Central Hudson Gas* test as the basic method of deciding commercial speech cases.

### A. Parts One and Two: Protected Speech and State Interest

We assume, following the discussion above, that liquor advertising in Mississippi should be treated at the outset as protected commercial speech. There can be no question, on the next step, that Mississippi does assert a substantial interest, which the state describes to be "safeguarding the health, safety and general welfare of its citizens by controlling the artificial stimulation of liquor sales and consumption created by the advertising of liquor." Whatever the medicinal or social value for those who use alcohol moderately, alcohol abuse takes an enormous toll from society and the lives of many people. Testimony in *Lamar Outdoor Advertising* concentrated on the role alcohol plays in coronary heart disease, gastrointestinal cancer, cirrhosis of the liver, traffic accidents, and occupational and family problems. The court in *Dunagin* took judicial notice of these problems. 489 F.Supp. at 771 n. 11.

### B. Part Three: Direct Advancement of The State Interest

The dispute begins with the third part of the *Central Hudson Gas* test. Does Mississippi's restriction against advertising directly advance the asserted state interest? In *Dunagin,* the trial judge, relying on the expert affidavit presented or his own knowledge and common sense, concluded in a summary judgment that "[t]he purpose of advertising alcoholic beverages is to promote consumption and thereby stimulate sales of alcoholic beverages. Increased sales of these beverages are highly correlated with increased problems associated with their use." 489 F.Supp. at 771 n. 11.

Other courts facing similar fact situations have reached the same conclusion—that advertising and consumption are directly linked. In *Queensgate Investment Co. v. Liquor Control Commission,* 69 Ohio St.2d 361, 433 N.E.2d 138, 142, *appeal dismissed,* —— U.S. ——, 103 S.Ct. 31, 74 L.Ed.2d 45 (1982), the Ohio Supreme Court found that "[t]he advertising of drink prices and price advantages would encourage and stimulate excessive consumption of alcoholic beverages; and advertising prohibition aids the interest in preventing that consumption." In *Oklahoma Telecasters Ass'n v. Crisp,* 699 F.2d 490, 501 (10th Cir.1983), *cert. granted sub nom. Capital Cities Cable, Inc. v. Crisp,* —— U.S. ——, 104 S.Ct. 66, 78 L.Ed.2d 81 (1983) the Tenth Circuit found it not "constitutionally unreasonable for the State of Oklahoma to believe that advertising will not only increase sales of particular brands of alcoholic beverages but also alcoholic beverages generally." *See also Williams v. Spencer,* 622 F.2d 1200, 1205 (4th Cir.1980) (agreeing with trial court's judicial notice that "an advertisement encouraging the use of drugs encourages actions which in fact endanger the health or safety of students"); *Capital Broadcasting v. Mitchell,* 333 F.Supp. 582, 586 (D.D.C.1971) (three-judge court), *aff'd mem.,* 405 U.S. 1000, 92 S.Ct. 1289, 31 L.Ed.2d 472 (1972) (noting "close relationship between cigarette commercials

broadcast on the electronic media and their potential influence on young people").

The trial judge in *Lamar Outdoor Advertising* heard testimony from experts on the issue. The advertisers' expert, a professor of sociology who has specialized in alcoholism, testified that advertising only affected brand loyalty and market share, rather than increasing overall consumption or consumption of individual consumers. The state's expert, a medical doctor and professor of psychiatry who has done research in alcoholism, testified that there was "a strong correlation between an increase in alcohol advertising and consumption." 539 F.Supp. at 821. The trial court found that "[d]efendants failed to produce concrete scientific evidence to substantiate their position that alcohol advertising artificially stimulates consumption thereof," and concluded that Mississippi's regulation of advertising "does little to directly advance the government's interest in promoting temperance." *Id.* at 829.[8]

**8.** The degree to which an appellate court should defer to the "fact" findings of a trial judge as to the latest truths in the social sciences is an interesting question. The argument can be made that as long as the trial court applied the right legal test or the appropriate level of scrutiny, his findings under each prong of the test, here the *Central Hudson Gas* test, and his decision should be upheld on appeal. The *Lamar Outdoor Advertising* court's finding that advertising restrictions do not directly advance the state's interests since there is no scientifically concrete link between advertising and alcohol consumption sounds very much like a finding of fact. Should this finding be subject only to a clearly erroneous standard of review? Clearly not.

In the first place, the issue of whether there is a correlation between advertising and consumption is a legislative and not an adjudicative fact question. It is not a question specifically related to this one case or controversy; it is a question of social factors and happenings which may submit to some partial empirical solution but is likely to remain subject to opinion and reasoning. *See* Fed.R.Evid. 201 advisory committee note. That reasoning is the responsibility of legislators and judges, assisted by scholars as well as social scientists. The specific issue here was undoubtedly considered by the Mississippi Legislature when local option and the curtailment of liquor consumption were being studied. Now the issue has moved to the judicial stage. If the legislative decision is not binding at this stage, at least it carries great weight. Certainly it cannot be thrust aside by two experts and a judicial trier of fact.

The writings and studies of social science experts on legislative facts are often considered and cited by the Supreme Court with or without introduction into the record or even consideration by the trial court. *E.g., Barefoot v. Estelle,* —— U.S. ——, —— n. 7, 103 S.Ct. 3383, 3397 n. 7, 77 L.Ed.2d 1090 (1983) (validity of predictions of violent behavior); *New York v. Ferber,* 458 U.S. 747, —— n. 9, 102 S.Ct. 3348, 3355 n. 9, 73 L.Ed.2d 1113 (1982) (the effect upon the child used as a subject for pornographic materials); *Ballew v. Georgia,* 435 U.S. 223, 231 n. 10, 233 n. 11, 98 S.Ct. 1029, 1034 n. 10, 1035 n. 11, 55 L.Ed.2d 234 (1978) (effect of the size of jury upon deliberation and verdict); *Gregg v. Georgia,* 428 U.S. 153, 184 n. 31, 96 S.Ct. 2909, 2930 n. 31, 49 L.Ed.2d 859 (1976) (the deterrent effect of capital punishment); *Paris Adult Theatre I v. Slaton,* 413 U.S. 49, 58 n. 8, 93 S.Ct. 2628, 2635 n. 8, 37 L.Ed.2d 446 (1973) (the relation between obscenity and socially deleterious behavior); *Brown v. Board of Education of Topeka,* 347 U.S. 483, 494 n. 11, 74 S.Ct. 686, 692 n. 11, 98 L.Ed. 873 (1954) (the effect of segregation upon minority children).

Furthermore, the decision on whether a regulation of commercial speech directly advances the state's interest, for example, is an exercise of constitutional adjudication wherein appellate courts play a special role. Applying the legal tests that have evolved in constitutional law invariably requires subtle legal distinctions, a sense of history, and an ordering of conflicting rights, values and interests. The Supreme Court has often warned that each First Amendment case must be analyzed separately, based on the particular method of communication involved, and the values and dangers implicated. *Metromedia, Inc. v. City of San Diego,* 453 U.S. 490, 501, 101 S.Ct. 2882, 2889, 69 L.Ed.2d 800 (1981); *FCC v. Pacifica Foundation,* 438 U.S. 726, 748, 98 S.Ct. 3026, 3039, 57 L.Ed.2d 1073 (1978); *Southeastern Promotions, Ltd. v. Conrad,* 420 U.S. 546, 557, 95 S.Ct. 1239, 1245, 43 L.Ed.2d 448 (1975); *Joseph Burstyn, Inc. v. Wilson,* 343 U.S. 495, 503, 72 S.Ct. 777, 781, 96 L.Ed. 1098 (1952); *Kovacs v. Cooper,* 336 U.S. 77, 97, 69 S.Ct. 448, 458, 93 L.Ed. 513 (1949). "The protection available for particular commercial expression turns on the nature both of the expression and of the government interests served by its regulation." *Central Hudson Gas, supra,* 447 U.S. at 563, 100 S.Ct. at 2350. The questions raised in such cases involve mixed questions of law and fact. In this case, for instance, the extent to which *Metromedia, Bellanca, LaRue* and other cases temper the *Central Hudson Gas* test is a legal question.

There are limits to which important constitutional questions should hinge on the views of social scientists who testify as experts at trial. Suppose one trial judge sitting in one state

The plaintiffs in *Lamar Outdoor Advertising* support their standing by estimating that they lose hundreds of thousands of dollars of advertising income by virtue of the Mississippi restriction. *See Metromedia, Inc. v. City of San Diego,* 453 U.S. 490, 504 n. 11, 101 S.Ct. 2882, 2890 n. 11, 69 L.Ed.2d 800 (Justice White, for plurality), 544, 101 S.Ct. at 2911 (Justice Stevens, dissenting in part) (1981). It is beyond our ability to understand why huge sums of money would be devoted to the promotion of sales of liquor without expected results, or continue without realized results. No doubt competitors want to retain and expand their share of the market, but what businessperson stops short with competitive comparisons? It is total sales, profits, that pay the advertiser; and dollars go into advertising only if they produce sales. Money talks: it talks to the young and the old about what counts in the marketplace of

our society, and it talks here in support of Mississippi's concerns.

The approach taken by the Supreme Court in *Central Hudson Gas* is worthy of study here. There the Court found:

> There is an immediate connection between advertising and demand for electricity. Central Hudson would not contest the advertising ban unless it believed that promotion would increase its sales. Thus, we find a direct link between the state interest in conservation and the Commission's order.

447 U.S. at 569, 100 S.Ct. at 2353. The plaintiffs here try to distinguish *Central Hudson Gas* by arguing that the electric utility in that case was a monopoly, and therefore was not competing for a share of the market as are the advertisers here. In fact, however, the Court expressly found

believes a sociologist who has found no link between alcohol abuse and advertising, while another trial judge sitting in another state believes a psychiatrist who has reached the opposite conclusion. A similar situation actually occurred here. Should identical conduct be constitutionally protected in one jurisdiction and illegal in another? Should the fundamental principles of equal protection delivered in *Brown v. Board of Education of Topeka,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), be questioned if the sociological studies regarding racial segregation set out in the opinion's footnote 11 are shown to be methodologically flawed? Should the constitutionality of the property tax as a means of financing public education, resolved in *San Antonio Independent School District v. Rodriguez,* 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973), depend on the prevailing views of educators and sociologists as to the existence of a cost-quality relationship in education? Does capital punishment become cruel and unusual when the latest regression models demonstrate a lack of deterrence? The social sciences play an important role in many fields, including the law, but other unscientific values, interests and beliefs are transcendent.

Perhaps for these reasons, the Supreme Court's recent commercial speech and other relevant speech cases indicate that appellate courts have considerable leeway in deciding whether restrictions on speech are justified. In none of them did the Court rely heavily on fact findings of the trial court. In *Bolger v. Youngs Drug Products Corp.,* —— U.S. ——, 103 S.Ct. 2875, 77 L.Ed.2d 469 (1983), the Court struck down 39 U.S.C. § 3001(e)(2), a law prohibiting

the mailing of unsolicited contraceptive advertisements. It agreed that the government had a substantial interest in aiding parents' efforts to control the manner in which their children became informed about birth control. The Court held, however, that the statute provided only the most limited incremental support for the interest asserted, in part by "reasonably assum[ing] that parents already exercise substantial control over the disposition of mail once it enters their mailboxes." 103 S.Ct. at 2884. In *Metromedia,* despite assertions that "the record is inadequate to show any connection between billboards and traffic safety" the judgment of the Court agreed with the "common-sense" belief of local lawmakers and other courts that billboards do pose substantial traffic safety hazards. 453 U.S. at 508–09, 101 S.Ct. at 2892–93. In *Bellanca,* the Court again deferred to the "common sense" conclusion of the state legislature that "any form of nudity coupled with alcohol in a public place begets undesirable behavior." 452 U.S. at 718, 101 S.Ct. at 2601. Similarly in *Central Hudson Gas,* the Court in another apparent exercise of judicial notice found "an immediate connection between advertising and demand for electricity" and therefore a direct link between the ban on advertising and the state interest in conservation. 447 U.S. at 569, 100 S.Ct. at 2353. *See also Guzick v. Drebus,* 431 F.2d 594, 599 (6th Cir.1970), *cert. denied,* 401 U.S. 948, 91 S.Ct. 941, 28 L.Ed.2d 231 (1971) (holding in First Amendment case that, "when dealing with questions of constitutional magnitude, we are not at liberty to accept the fact trier's findings merely because we consider them not 'clearly erroneous'" under Fed.R.Civ.P. 52(a)).

that the utility was in direct competition with other suppliers in certain markets:

> Monopoly over the supply of a product provides no protection from competition with substitutes for that product. Electric utilities compete with suppliers of fuel oil and natural gas in several markets, such as those for home heating and industrial power. This Court noted the existence of inter-fuel competition 45 years ago, see *West Ohio Gas Co. v. Public Utilities Comm'n,* 294 U.S. 63, 72, 55 S.Ct. 316, 321, 79 L.Ed. 761 (1935). Each energy source continues to offer peculiar advantages and disadvantages that may influence consumer choice.

*Id.* at 567.

*Metromedia* is also instructive. While noting the meager record on the question of whether the billboard ban directly advanced governmental interests, the judgment of the Court continued:

> Noting that "[b]illboards are intended to, and undoubtedly do, divert a driver's attention from the roadway," *ibid.,* and that whether the "distracting effect contributes to traffic accidents invokes an issue of continuing controversy," *ibid.,* the California Supreme Court agreed with many other courts that a legislative judgment that billboards are traffic hazards is not manifestly unreasonable and should not be set aside. We likewise hesitate to disagree with the accumulated, common-sense judgments of local lawmakers and of the many reviewing courts that billboards are real and substantial hazards to traffic safety. There is nothing here to suggest that these judgments are unreasonable. As we said in a different context, *Railway Express Agency, Inc. v. New York, supra,* [336 U.S. 106] at 109, 69 S.Ct. [463] at 465 [93 L.Ed. 533]:
>
> > "We would be trespassing on one of the most intensely local and specialized of all municipal problems if we held that this regulation had no relation to the traffic problem of New York City. It is the judgment of the local authorities that it does have such a relation. And

nothing has been advanced which shows that to be palpably false."

453 U.S. at 508–09, 101 S.Ct. at 2892–93. As in *Metromedia,* the subject of regulation here—liquor—must be viewed as a matter of peculiar importance to state and local authorities by virtue of the Twenty-first Amendment.

■ We conclude that the advertising ban is sufficiently justified to pass constitutional muster. We simply do not believe that the liquor industry spends a billion dollars a year on advertising solely to acquire an added market share at the expense of competitors. Whether we characterize our disposition as following the judicial notice approach taken in *Central Hudson Gas,* or following the "accumulated, common-sense judgment" approach taken in *Metromedia,* we hold that sufficient reason exists to believe that advertising and consumption are linked to justify the ban, whether or not "concrete scientific evidence" exists to that effect. Moreover, we believe that the added presumption in favor of validity required by *LaRue, Bellanca* and *Queensgate* helps to establish the balance in favor of the state, if balancing be necessary.

The advertisers argued, to the satisfaction of the trial judge in *Lamar Outdoor Advertising,* that even if there is a connection between advertising and consumption, the intrastate advertising ban does no good because Mississippi residents are "inundated" and "saturated" with liquor advertising in broadcasts, magazines and newspapers entering from outside the state. 539 F.Supp. at 829–30.

We do not find this argument compelling for several reasons. First, the plaintiffs would not be pursuing this case so vigorously if the market were truly saturated. They believe that they will find customers interested in further promoting liquor products. Second, their evidence that liquor advertisements appeared in national magazines in the Jackson library, out-of-state radio and television broadcasts and out-of-state newspapers does not establish that advertising would not dramatically increase

if the intrastate ban is invalidated. Again, the willingness of the fifty-six plaintiffs in *Lamar Outdoor Advertising* to litigate this matter suggests otherwise. Third, this argument cuts both ways. The commercial speech doctrine was created primarily out of concern in protecting consumers and the information they receive. If it were true that consumers are now being inundated with commercial information about liquor in contravention of the state's interests, the values behind the commercial speech doctrine would not be very much threatened.

### C. Part Four: Extensiveness of The Regulation

Finally, we hold that the advertising restrictions are not more extensive than necessary to serve the state interest, as required by the fourth element of *Central Hudson Gas*. Again, we must apply this requirement in light of *LaRue, Bellanca* and *Queensgate. See LaRue,* 409 U.S. at 116, 93 S.Ct. at 395 ("wide latitude as to choice of means ... must be accorded the state agency").

■ The state restrictions on liquor advertising are no broader than necessary to pursue its goal of preventing the artificial stimulation and promotion of liquor sales and consumption. No other types of advertising are restricted.

Again, we find the plurality's opinion in *Metromedia* helpful:

[W]e reject appellants' claim that the ordinance is broader than necessary and, therefore, fails the fourth part of the *Central Hudson* test. If the city has a sufficient basis for believing that billboards are traffic hazards and are unattractive, then obviously the most direct and perhaps the only effective approach to solving the problems they create is to prohibit them. The city has gone no farther than necessary in seeking to meet its ends. Indeed, it has stopped short of fully accomplishing its ends: It has not prohibited all billboards, but allows onsite advertising and some other specifically exempted signs.

453 U.S. at 508, 101 S.Ct. at 2892. By analogy, the state here believes that the advertising itself represents a hazard to the health, safety and welfare of its citizens. The restrictions permit certain types of informational advertising of use to the consumer such as price advertising inside licensed premises, but bar those displays that it believes will encourage excess consumption.

We do not believe that a less restrictive time, place and manner restriction, such as a disclaimer warning of the dangers of alcohol, would be effective. The state's concern is not that the public is unaware of the dangers of alcohol. *See* Restatement (Second) of Torts § 402A comment j (1965) (sellers of alcoholic beverages not required to warn of dangers, which are generally known and recognized). The concern instead is that advertising will unduly promote alcohol consumption despite known dangers.[9]

The advertisers offer, as an example of constitutional manner and timing of advertising regulation, the prohibition of a billboard, located by a drive-through bar at the edge of a wet county line, announcing that the bar offers "the last chance to buy mixed drinks for the next 30 miles." That prohibition would be proper, they say, because the billboard intentionally promotes dangerous consumption and unlawful transportation while driving 30 miles through the dry county. The mistake of that argument is that it regards the state interest as being opposed only to the unlawful use of liquor. But Mississippi's policy is much broader, as stated in the 1966 statute: it is against the sale and possession of intoxicating liquor. All billboards advertising liquor are adverse to that policy and interest for the same reason that the billboard of the last-chance bar would be adverse to a policy against transportation of liquor through a dry county.

---

**9.** *Cf. Capital Broadcasting, supra,* 333 F.Supp. at 585 ("Congress had convincing evidence that the Labeling Act of 1965 had not materially reduced the incidence of smoking").

## IV. Equal Protection

The plaintiffs maintain in the alternative that the Mississippi advertising ban violates the Equal Protection Clause of the Fourteenth Amendment, in that it discriminates against the local media by banning intrastate advertising while allowing advertising to enter Mississippi from out-of-state media. The district court in *Lamar Outdoor Advertising* agreed, finding no rational link between the classification and the goal of controlling the artificial stimulation of the sale and consumption of artificial beverages. 539 F.Supp. at 830–31.

The plaintiffs ask us to apply the strict scrutiny standard of review, relying on the fundamental rights strand of strict scrutiny equal protection doctrine. The Supreme Court has limited the fundamental rights subject to strict scrutiny to those rights which are explicitly or implicitly guaranteed by the Constitution. *San Antonio Independent School District v. Rodriguez,* 411 U.S. 1, 34, 93 S.Ct. 1278, 1297, 36 L.Ed.2d 16 (1973). Freedom of speech is of course a fundamental right that would ordinarily trigger strict scrutiny. *Police Department of Chicago v. Mosley,* 408 U.S. 92, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972). The plaintiffs reason that, since the First Amendment has been extended to commercial speech which concerns lawful activity and is not misleading, strict scrutiny is appropriate.

Strict scrutiny is clearly inappropriate. In this case we have held the Mississippi law entirely legal under the First Amendment, and parties cannot insist on strict scrutiny merely by asserting a First Amendment right that the court ultimately finds not to be violated. Furthermore, in all cases commercial speech is entitled to only a limited measure of protection under a different standard of review. Under the *Central Hudson Gas* test, the state must demonstrate a substantial interest which is directly advanced by the regulation. If the right to advertise for profits were fundamental, then parties to any particular commercial speech regulation could rely on a stricter standard of review—requiring a compelling state interest and necessary means chosen to attain it—by locating an unregulated class of advertisers and insisting on an equal protection analysis by the court.

It is important to recognize that, for identification with the commercial speech doctrine and the interests it protects, there is no classification here on which an equal protection analysis can be based. Commercial speech has been termed "unique because the speech does not advance any value implicating the interests of the speaker in the speech." Note, *Constitutional Protection of Commercial Speech,* 82 Colum.L. Rev. 720, 750 (1982). The primary interests protected are those of the *listener*—the consumer—in *receiving* information. In *Virginia Board of Pharmacy,* the Court made clear that the First Amendment protects the right to receive information, 425 U.S. at 756–57, 96 S.Ct. at 1822–23, and noted that "[a]s to the particular consumer's interest in the free flow of commercial information, that interest may be as keen, if not keener by far, than his interest in the day's most urgent political debate," *id.* at 763, 96 S.Ct. at 1826. We do not mean to suggest that media advertisers lack standing to challenge commercial speech regulations. *See Metromedia,* 453 U.S. at 504 n. 11, 101 S.Ct. at 2890 n. 11 (Justice White, for plurality), 544, 101 S.Ct. at 2911 (Justice Stevens, dissenting in part). Nevertheless, "[t]he First Amendment's concern for commercial speech is based on the informational function of advertising ... [and] there can be no constitutional objection to the suppression of commercial messages that do not accurately inform the public about lawful activity." *Central Hudson Gas,* 447 U.S. at 563, 100 S.Ct. at 2350.

Hence, unlike other areas of First Amendment protection, the commercial speech doctrine is concerned primarily with the level and quality of information reaching the listener. From this vantage point, there is no classification upon which the plaintiffs can assert a meaningful equal protection claim. From the standpoint of the consumer, all residents in Mississippi have access to liquor advertising from inter-

state and intrastate sources, and indeed receive a great deal of out-of-state advertising according to the plaintiffs. There is no discrimination against particular classes of consumers in the state.

■ While the economic interests of the intrastate advertisers are at a disadvantage compared with those of the interstate media, this fact raises no First Amendment concerns for the reasons explained above, and gives rise to an equal protection issue requiring only minimal scrutiny. Under such deferential scrutiny of economic regulation, the classification challenged need only be rationally related to a legitimate state interest, *New Orleans v. Dukes,* 427 U.S. 297, 303, 96 S.Ct. 2513, 2516, 49 L.Ed.2d 511 (1976), and is invalid only if "wholly irrelevant to the achievement of the State's objective," *McGowan v. Maryland,* 366 U.S. 420, 425, 81 S.Ct. 1101, 1104, 6 L.Ed.2d 393 (1961).

Most assuredly there is nothing suspect about a state discriminating against its own citizens, in this case advertisers originating messages within the state. The state argues that it lacks jurisdiction to control transmissions and mailings entering its boundaries from other states, and cannot, for practical and legal reasons, block such disseminations. The state has reasonably chosen to restrict its regulation to those over which it has control. The Equal Protection Clause does not require "a legislature to enact a statute so broad that it may well be incapable of enforcement." *Michael M. v. Superior Court of Sonoma County,* 450 U.S. 464, 474, 101 S.Ct. 1200, 1207, 67 L.Ed.2d 437 (1981). We think it exceedingly unlikely that the state could block, jam, or otherwise ban all magazines, newspapers, cable signals and radio and television broadcasts originating from other states that contain liquor advertisements, as a practical matter, and in the face of the Commerce Clause, the Supremacy Clause and the First Amendment. In upholding a Utah regulation that banned cigarette billboards while allowing cigarette advertisements in interstate publications, Justice Brandeis stated that "[i]t is a reasonable ground of classifi-

cation that a state has power to legislate with respect to persons in certain situations and not with respect to those in a different one." *Packer Corporation v. Utah,* 285 U.S. 105, 110, 52 S.Ct. 273, 274, 76 L.Ed. 643 (1932). Furthermore, with economic regulation, "reform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind." *Williamson v. Lee Optical of Oklahoma, Inc.,* 348 U.S. 483, 489, 75 S.Ct. 461, 465, 99 L.Ed. 563 (1955). The state could have concluded rationally that local advertising was the promotion of intoxicating liquor that was susceptible to regulation.

### V.

We conclude that the Mississippi regulatory scheme is constitutionally valid. The judgment in *Dunagin* is AFFIRMED. The judgment in *Lamar Outdoor Advertising* is REVERSED.

JERRE S. WILLIAMS, Circuit Judge, with whom TATE, Circuit Judge, joins, specially concurring:

### I.

I agree wholeheartedly with the result reached by the majority. I also am in full agreement with the Court's reliance upon the test developed in *Central Hudson Gas & Electric Corp. v. Public Service Commission of New York,* 447 U.S. 557, 566, 100 S.Ct. 2343, 2351, 65 L.Ed.2d 341 (1980). The application of this test properly leads us to the result reached by the majority.

It is with regret that I cannot join in the majority opinion, however, because of implications it sees in the Twenty-first Amendment. The majority opinion in Part II B discusses the Twenty-first Amendment as having implications justifying unusual and wholly unique intrusions upon the personal liberties of American citizens in the regulation of intoxicating liquor. I concede that there has been some indication of this possible effect of the Twenty-first amendment in *California v. LaRue,* 409 U.S. 109, 114, 93 S.Ct. 390, 395, 34 L.Ed.2d 342 (1972), and in

*New York State Liquor Authority v. Bellanca,* 452 U.S. 714, 717, 101 S.Ct. 2599, 2601, 69 L.Ed.2d 357 (1981). I view the doctrine as mischievous and insidious.

The purpose of the Twenty-first Amendment was to remove all constitutional inhibitions as to the state's power to control intoxicating liquors as against the powers of the federal government, particularly but not exclusively in the domain of interstate and foreign commerce. It had nothing whatsoever to do with encroachment upon the individual liberties protected in the Constitution. The governments, state and federal, had exactly the same powers to control spirits after the passage of the Twenty-first Amendment as they had before, as against claims of individual liberty under free-speech, due process, and equal protection.

A conclusion that the Twenty-first Amendment justifies greater intrusions upon the constitutional liberties of individual citizens than would otherwise be the case is an insidious doctrine because it holds that the Constitution places liquor in a totally unique position different from even dangerous drugs and other vice-prone products or occupations.

The power to control the production, sale, advertising, and consumption of intoxicating beverages in ways different from controlling the same social processes as they relate to food products, automobiles, television sets, and the like is based wholly upon the recognition that spirits create special problems which entitle the state to react with special legislative solutions. This recognition has been with us from the beginning of our society right up to the present. It falls in the area of "police power," if you will. It does not depend to any degree upon the Twenty-first amendment.

In recognizing the special problems related to liquor regulation, I have no difficulty whatsoever in agreeing with the cogent analysis of the majority opinion that the control of liquor advertising by the State of Mississippi does not run afoul of the constitutional protections of individual liberty. To hold otherwise exalts commercialism above the genuine concerns the State of Mississippi has a right to feel for its citizens, and the problems that liquor creates in our society.

II.

In one other matter I wish to reinforce the analysis in the majority opinion. The Court describes the "battle of the experts" on the question of whether advertising simply induces people to change brands of liquor or actually stimulates consumption. What this battle of the experts was actually asking us to do was to engage in the now outmoded substantive economic due process analysis. The fact that there was a battle of the experts on this issue proved that the issue was one of legislative policy. If the legislature of the State of Mississippi believes that liquor advertising increases liquor consumption, that is a legislative judgment that it has a right to make. And the fact that there may be some experts who think otherwise justifies testimony before the legislative committee considering the legislation but does not justify a demand that this Court resolve that policy decision. To treat this issue as subject to our power to decide would lapse into the now thoroughly discredited earlier Supreme Court due process analysis which is exemplified by the statement by the Court in the notorious *Lochner v. State of New York* case, 198 U.S. 45, 57, 25 S.Ct. 539, 543, 49 L.Ed. 937 (1905): "Clean and wholesome bread does not depend upon whether the baker works but ten hours per day or only sixty hours a week.... There is, in our judgment, no reasonable foundation for holding this to be necessary or appropriate as a health law to safeguard the public health or the health of the individuals who are following the trade of a baker."

It is not for the courts to tell the states that they no longer have power to place reasonable limitations upon the commercial aspects of businesses which the state properly feels create a high level of social concern. The states can ban the sale of liquor entirely, just as they can of dangerous drugs. They can limit the sale to state-owned package stores. They can ration.

They can prohibit all consumption of intoxicating beverages in public. They can engage in many types of regulations of varying stringency. To hold that one of those regulations cannot be a restriction on commercial exploitation by way of advertising would be a curious and unjustifiable anomaly.

GEE, Circuit Judge, with whom GOLDBERG, POLITZ, RANDALL and HIGGINBOTHAM, Circuit Judges, join, dissenting:

Judge Reavley's opinion for a majority of the court—workmanlike and thorough as always—takes a view of the Mississippi arrangement regulating liquor advertising with which it is hard to disagree violently. Even so, I believe that the better one is expressed in our panel opinions, reported at 701 F.2d 314 and 335. Since it is there set out in great detail, I see no occasion to write further.

For the reasons there expressed, then, I respectfully dissent.

HIGGINBOTHAM, Circuit Judge, concurring in the dissenting opinion:

I join Judge Gee's dissent. I remain convinced that the panel decision was a correct application of the doctrine of commercial speech as developed by the Supreme Court. I take advantage of the freedom of dissent to add this brief separate statement to express a view I do not see clearly stated elsewhere.

The immediate turn of this case in the long view of constitutional principle has little significance. The case may be little more than how judges view whiskey, or how judges apply their own notions of what is a good and what is a bad law. This intended exaggeration is a sufficiently accurate description of this type of judicial review that we are hesitant to cheerfully admit engaging in it. The point is that the balancing of interests exercise of *Virginia Board of Pharmacy* and its younger companions reduces the exaggeration to an uncomfortable level.

The efficiency with which a market allocates resources unquestionably depends on a free flow of market information. I had supposed that it was the province of the Congress and particularly a state legislature to decide whether government ought to weigh into that free exchange; that is, I would not have thought it the role of the courts to quarrel with a state legislature's regulatory pushes and shoves of its own economy.

Nevertheless, the cases instruct that we are to so review and I am reluctant to express my own doubts, which go to the very notion of commercial speech, by applying those cases in a less than faithful way. Doing so substitutes one brand of activism for another.

I agree with much of the majority opinion and much of Judge Williams' concurring opinion but I suggest that hesitancy about the type of inquiry provoked by the commercial speech doctrine has affected the weighing of the state's asserted interests. If the First Amendment is a source of protection for the flow of market information to consumers it is a remarkable draw upon First Amendment jurisprudence that turns that idea into a state's right to keep information pertinent to a lawful transaction from consumers for fear that consumers might misapply it. Of course we are Lochnerizing and intruding into the affairs of a state. I suggest that distaste for the intrusion has created a reluctance in actual application to give full sway to the commercial speech doctrine as developed by the Supreme Court, and was an unidentified hand on the weighing scale of the majority; that it was this added weight which separated the majority and dissenting opinions.

It is hard for me to see that Mississippi has "won" this case. It can ban the advertising of whiskey, true enough, but only because federal judges answerable to no voters have decided that they "agree" with the Mississippi legislature. In the long haul this is no win at all. That seems to me to be a predictable, if not inevitable, consequence of the doctrine itself. This exaggerates, but it is sufficiently accurate that we ought to be troubled. I am.