**Harold W. BUIRKLE, Plaintiff,**

v.

**The HANOVER INSURANCE COMPANIES, Defendant.**

Civ. A. No. 91–40116–K.

United States District Court, D. Massachusetts.

Aug. 12, 1993.

Final Judgment Aug. 27, 1993.

Charles E. Schaub and Susan B. Tuchman, Hinckley, Allen, Snyder & Comen, Boston, MA, for plaintiff.

Lauren B. Pillsbury, Morrison, Mahoney & Miller, Boston, MA, for defendant.

## OPINION

KEETON, District Judge.

The decisive issue in this case is whether the defendant, the Hanover Insurance Com-

panies ("Hanover"), insurer under the liability insurance coverages of two policies issued to plaintiff, Harold W. Buirkle, plaintiff ("Buirkle"), had a duty to defend Buirkle in *AroChem International, Inc. v. Buirkle,* 968 F.2d 266 (2d Cir.1991) (the "Underlying Action"). Hanover declined to defend. Counsel engaged by Buirkle defended to a successful conclusion.

After Phase One of a nonjury trial, and subject to reconsideration as provided in the Order attached to this Opinion, I find for the defendant on this issue for the reasons explained in this Opinion.

Before stating my findings and conclusions on the merits, I address procedural matters that affected development of this case and illustrate some recurring obstacles to prompt, efficient, and just resolution of disputes on the merits.

### I. Cross–Motions for Summary Judgment and Alternatives

#### A. Genuinely Disputed and Material Adjudicative Facts

Early in the history of this case, the parties filed cross-motions for summary judgment.

As a matter of prudential case management, it is my practice to discourage such motions and encourage, in their stead, a trial on stipulated facts of the potentially dispositive issue or issues that are the subject of one or both of the proposed cross-motions. In some circumstances (as this case illustrates), a first-phase trial may be limited to an issue that is dispositive of the entire case under one possible outcome, though leaving other issues to be tried in a later phase or phases under another possible outcome.

#### 1. Historical Facts

■ A dispute of fact exists if, on the evidence before the court, reasonable factfinders could differ about some historical fact (what happened, when, and where). If the fact in dispute is material to some adjudicative issue, the existence of the dispute defeats both cross-motions for summary judgment. The dispute must be resolved by a factfinder (the jury, if one has been demanded, or the judge as factfinder in a nonjury trial).

#### 2. Evaluative Determinations

■ Even if all material historical facts are undisputed, a case cannot be decided on cross-motions for summary judgment if a reasonably disputable evaluative determination is essential to disposition and it is the kind of evaluative determination that, under applicable precedents, is one of "adjudicative fact" and must therefore be made by the factfinder. *Cf. Springer v. Seamen,* 821 F.2d 871, 876 (1st Cir.1987) ("Not only ordinary fact questions, but also evaluative applications of legal standards (such as the legal concept of 'foreseeability') to the facts are properly [questions for the factfinder].") (citation, internal quotation marks, and footnote omitted) (quoted with approval in *Dedham Water v. Cumberland Farms Dairy,* 972 F.2d 453, 457 (1st Cir.1992) (causation); and *Swift v. United States,* 866 F.2d 507, 511 (1st Cir.1989) (causation)).

#### B. Nonadjudicative Factfinding

Even if disputable evaluative determinations must be made to decide a case, however, it does not necessarily follow that they cannot be made by a trial court on cross-motions for summary judgment.

■ For example, it may be argued that, in the circumstances of the case, one or more evaluative determinations must be made by a court in order to decide an issue of law. In such circumstances, these determinations are interwoven with the legal ruling; because the evaluative determinations are essential premises of the legal ruling, it is difficult if not impossible to state the legal ruling precisely without incorporating these evaluative premises into the statement. For that reason, the evaluative premises are subject to nondeferential review on appeal, rather than review under the deferential standard of Federal Rule of Civil Procedure 52(a). Otherwise, different outcomes of like cases in different trial courts, decided by different "factfinders," would utterly frustrate the aim of the legal system that like cases be decided in the same way, regardless of the identity of the

decisionmakers to whom the various cases happen to be assigned.

Stated another way, the argument is that evaluative determinations of this kind, to the extent that they are determinations of fact in any sense, are determinations of "premise facts"—that is, nonadjudicative facts that serve as premises of a legal ruling that, unless overturned on appeal, have the force of precedent. *See* Robert E. Keeton, *Legislative Facts and Similar Things: Deciding Disputed Premise Facts*, 73 Minn.L.Rev. 1 (1988) (cited hereafter as *Premise Facts*).

In the case now before this court (and in cases of this kind generally) if neither party contends, even in the alternative, that evaluative determinations required to decide the issues raised by the cross-motions for summary judgment should be made by an adjudicative factfinder, the evaluative nature of those determinations is not necessarily an obstacle to final decision of issues of this kind on the pending cross-motions for summary judgment.

If either party contends otherwise, however, even in the alternative, proceeding with cross-motions for summary judgment runs a high risk of a substantial waste of private and public resources. *See, e.g., Continental Grain v. Puerto Rico Maritime Shipping*, 972 F.2d 426, 429 n. 7 (1st Cir.1992) (citing *Boston Five Cents Sav. Bank v. Secretary of the Dep't of Housing and Urban Dev.*, 768 F.2d 5, 11–12 (1st Cir.1985)).

### C. The Stipulation in This Case

The parties to this case responded positively to the court's encouraging them to agree to a Phase One Trial of duty-to-defend issues on stipulated facts. The stipulated facts are as follows:

1. Buirkle was a named insured under a Homeowners Policy issued by Hanover, a true and accurate copy of which is attached hereto as Exhibit "A."

2. Buirkle was also a named insured under a Personal Catastrophe Liability Policy issued by Hanover, a true and accurate copy of which is attached hereto as Exhibit "B."

3. On or about May 3, 1990, an action was brought in New York state court against Buirkle (the "Underlying Action"). The Underlying Action was removed to the United States District Court for the Southern District of New York on or about June 5, 1990. A true and accurate copy of the complaint against Buirkle in the Underlying Action is attached hereto as Exhibit "C."

4. Buirkle gave Hanover written notice of the Underlying Action on or about June 1, 1990. A true and accurate copy of the notice is attached hereto as Exhibit "D."

5. On or about June 26, 1990, Hanover gave Buirkle written notice that it would not provide him with a defense in the Underlying Action. A true and accurate copy of the notice is attached hereto as Exhibit "E."

6. Buirkle again requested that Hanover provide him with coverage and a defense by letter dated September 4, 1990, a true and accurate copy of which is attached hereto as Exhibit "F."

7. Buirkle again requested that Hanover participate in resolving the matter of his coverage and defense by letter dated January 4, 1991, a true and accurate copy of which is attached hereto as Exhibit "G."

8. Hanover would not defend Buirkle in the Underlying Action.

9. As a result, Buirkle retained his own counsel to defend his interests in the Underlying Action.

10. The Underlying Action was tried before a jury from June 3 through 6, 1991. On June 6, 1991, after the plaintiffs in the Underlying Action presented their case, the court granted a directed verdict in Buirkle's favor, and later issued a judgment in accordance with the verdict. The plaintiffs appealed from the judgment to the Court of Appeals for the Second Circuit. The Second Circuit affirmed the district court's decision.

11. Buirkle has incurred costs in defending himself in the Underlying Action.

(Docket No. 31, filed in open court October 1, 1992, entered in Docket December 4, 1992).

**D. *Post–Stipulation Proceedings in This Case***

On November 17, 1992, this case was called for nonjury trial on Phase One, limited to the issue of duty to defend. The parties offered in evidence their Stipulation of Facts, quoted above. Neither party offered any additional evidence. After hearing oral argument on the day of trial, I set a conference for December 11, 1992 to schedule proceedings for determination of damages should plaintiff prevail on liability, and took Phase One of the case under advisement.

At the conference of December 11, 1992, I advised the parties of my concern about lack of evidence on some potentially significant liability issues and suggested the possibility of reopening the evidence in Phase One. I allowed the parties time to submit a further stipulation or further proffers before I determined whether to reopen the evidence.

At further proceedings in the Phase One trial on February 10, 1993, I overruled plaintiff's objections to reopening the evidence and received additional evidence by affidavit, though sustaining objections to some parts of affidavits received. I took under advisement issues with respect to whether some parts of the affidavits would be received for consideration by the court only as to "premise" facts and not as to "adjudicative" facts. I also set a schedule for submission of additional memoranda by the parties.

After full consideration of all matters taken under advisement, I now conclude that there are indeed some "premise" fact issues that must be determined in this case, and some genuinely disputed and material adjudicative fact issues as well.

■ As to the reopening of evidence bearing upon adjudicative fact questions, I now conclude that I should, and I do, sustain plaintiff's objection, which is grounded in part on the following stipulation of the parties:

The parties also stipulate and agree that the Court will find facts based solely on the stipulated-to facts contained herein, and that the Court may draw inferences of fact from the stipulated-to facts. The parties further stipulate and agree that they will submit no further evidence—either through live testimony or documentary evidence—to the Court at trial on the issue of Hanover's duty to defend.

Docket No. 31 at 1–2.

I conclude that, in view of this stipulation, it would be unfair to the plaintiff to reopen the evidence bearing upon *adjudicative* facts.

It does not follow, however, that the court should not have "reopened the evidence" bearing on *premise* facts. Indeed, for reasons explained in *Premise Facts*, 73 Minn. L.Rev. at 29–32, and for the reasons (as they bear particularly on this case) stated more fully in Parts VI–VIII, *infra*, I conclude that it was appropriate to receive additional evidence in relation to premise fact issues in this case. Indeed, as stated in the Order following this Opinion, I will, even now, allow the parties a further opportunity to file submissions in response to my provisional determination of premise facts in this Opinion.

**II. *The Insurance Policies and Questions They Present***

**A. *The Terms and Structure of the Insurance Policies***

**1. *The Promise of "Plain English"***

Each of the two policies, issued by Hanover to Buirkle in 1989, is written in "plain English." The "INTRODUCTION" to the Personal Catastrophe Liability Policy explains:

This is your new Personal Catastrophe Liability Policy. We have written it in plain English so you can understand just what coverage it offers. Please read it. If you have any questions, call or write your agent or us right away.

Exhibit B, page 1.

**2. *Length, Complexity, and Style***

Three characteristics of the Homeowners Policy undercut the laudable "plain English" objective. First, the policy is long. Second, and of more significant bearing in this case,

the package[1] is complex.[2] Third, the drafters of the policy generously used variations on a grant-withdraw-restore (or "grant, exclude, carve-out from the exclusion") drafting technique. One of the variations on this three-step technique was to insert a fourth step between the first and second, producing a grant-add-withdraw-restore technique.

An illustration of one possible reading of the Homeowners Policy and the New Jersey endorsement will help to explain the style.

(i) *Grant.* The basic grant of liability insurance coverage is stated at the beginning of "Section II–Liability Coverages." This section begins with "Coverage E–Personal Liability," which grants liability insurance coverage for a claim made or a suit brought "against an insured for damages because of *bodily injury* or property damage caused by an occurrence to which this coverage applies, . . . ." (Emphasis added).

(ii) *Add.* A New Jersey form of endorsement to the Homeowners policy adds to the grant by noting:

For an additional premium under Coverage E–Personal *Liability*, the *definition* of *bodily injury* is amended *to include personal injury.* [Emphasis added.]

(iii) *Withdraw (or "Exclude").* "This coverage does not apply to injury arising out of the business pursuits of an insured."

(iv) *Restore.* But this exclusion "does not apply to . . . activities which are usual to non-business pursuits . . . ."

Moreover, adding to the complexity produced by the four-step drafting technique is

1. The package includes a "Declaration" (consisting in this instance of two pages), a "Policy Jacket" (consisting of a cover sheet and a two-page insert captioned "Your Homeowners Policy Quick Reference," Form 231 0692 (10/84) HO 3 Ed. 4 84), the basic policy, and the NEW JERSEY Optional Endorsement Section. The total length is 54 numbered and a half dozen unnumbered pages.

The "Declaration" shows a total premium of $716 after $254 credits for deductibles, protective devices, and non-smoker discount. The liability coverage is not separately charged; instead it is included in a "Total Basic Premium" of $847 for Homeowners Coverage for Dwelling, Other Structures, Personal Property, and Section II Personal Liability.

2. The basic policy itself is 34 pages long. It contains the following main segments (many of which have subsegments):
. Agreement (page 1)
. Definitions (pages 1–2)
. Section I—Property Coverage (pages 3–9)
. Section I—Perils Insured Against (pages 10–13)
. Section I—Exclusions (pages 14–15)
. Section I—Conditions (pages 15–20)
. Section II—Liability Coverages (page 21)
. Section II—Exclusions (pages 22–26)
. Section II—Additional Coverage (pages 26–27)
. Section II—Conditions (pages 28–29)
. Section I and Section II—Conditions (pages 30–32)
. Notice (page 33)
. Signatures and a postscript entitled "Dear Policyholder" (page 34)
The NEW JERSEY Optional Endorsement Section—Form No. 231–1135, contains the following segments:
. HO–15 (Optional) Special Personal Property Coverage (Form HO–3 Only) (pages 1–4)

. HO–32 (Optional) Unit–Owners Coverage A Special Coverage Form HO–6 Only Ed. 4–84 (pages 4–6)
. HO–48 (Optional) Other Structures Increased Limits (Ed. 4–84) (page 6)
. HO–52 (Required) Renewal Plan (Ed. 5–84) (page 6)
. HO–53 (Optional) Credit Card, Fund transfer Card, Forgery and Counterfeit Money Coverage Increased Limit (Ed. 4–84) (page 7)
. HO–61 (Optional) Scheduled Personal Property Endorsement (Ed. 4–84) (pages 7–8)
. HO–82 (Optional) Personal Injury (Ed. 4–84)" (page 8),
. HO–90 (Required) Workers' Compensation (Residence Employees) (Ed. 4–84) (pages 9–11)
. HO–300 (Required) Special Provisions—New Jersey Ed. 4–84 (pages 11–12)
. HO–310 (Optional) Additional Interests Residence Premises (Ed. 4–84)" (page 12)
. HO–312 (Optional) Increased Limits on Business Property (Ed. 4–84) (pages 12–15)
. HO–315 (Optional) Earthquake (Ed. 7–85) (pages 13–14)
. Form 231–0600 (Required) Inflation Guard Endorsement (Ed. 4–83) (page 14),
. Form 231–0666 (Optional) Home Computer/Entertainment Center Coverage (Ed. 4–84) (pages 14–16),
. Form 231–0695 (Optional) Guaranteed Replacement Cost Endorsement (Ed. 4–84) (pages 16–17)
. Form 231–0699 (Optional) Special Package Endorsement (4–84) (pages 17–18),
. Form 231–0701 (Optional) Personal Property Replacement Cost (Ed. 5/88) (pages 18–19)
. Form 231–0749 (Optional) Personal Property Replacement Cost Broadened Coverage Endorsement (Ed. 5/85) (pages 19–20)
. Form 391–0565 (Optional) Premises Alarm or Fire Protection System (Ed. 1–83) (page 20).

the embellishment that both a withdrawal and a restoration may be total or partial and may be conditional or unconditional.

Even as to the provisions that are clearest in content, a reader cannot be certain of manifested meaning without examining the entire package to identify all relevant grants, additions, withdrawals, and restorations. The reader may then need to study again the selected provisions to determine just what parts of the relevant grants and additions to coverage remain after withdrawals and restorations are fully considered.

Plain English! Do structure, style, and readability count at all in drafting a policy "in plain English"?

### 3. Generalizations About Style and Drafting Technique

Drafting in a style that does not evidence the work of an accomplished stylist may nevertheless be stylish. In this instance, it is. The grant-withdraw-restore technique is not distinctive to insurance policy forms. It and closely analogous techniques (*e.g.*, "prohibit, withdraw part of the prohibition, restore part of the withdrawal"; "require, withdraw part of the requirement, restore part of the withdrawal") appear often in legal writing. Also, quite commonly (as in the insertion of the "add" step by appending the New Jersey endorsement to the Homeowners Policy and by making withdrawals and restorations partial or conditional), a drafter may insert more steps somewhere before, among, or after the basic three (grant-withdraw-restore) and may add bells and whistles as well. *See, e.g.*, I.R.C. § 74 (granting an exception to the definition of "gross income" in subdivision (b), adding another exception in subdivision

(c), in each subdivision arguably withdrawing to some extent and restoring to some extent through intricacies that include "if" and "but not" clauses); Fed.R.Civ.P. 12 (requiring in 12(b) that "[e]very defense" be asserted in the responsive pleading, "if one is required," except that certain defenses "may at the option of the pleader be made by motion," but such a motion "shall be made before pleading if a further pleading is permitted"). These illustrative "exception," "if," and "but not" clauses from a statute and a rule of procedure make the point that the insurance policy provisions that must be interpreted in this case are by no means at the extremes of embellishment one can find in the techniques that, historically, writers have used in drafting statutes, rules and regulations of courts and agencies, and contracts in general as well as insurance policies in particular. The fact that this style appears in many different forms of legal writing diminishes the force of two arguments that Buirkle repeatedly emphasizes in this case—his arguments for resolving alleged ambiguities in his favor and for honoring his allegedly reasonable expectations.

It is true that the two policies on which Buirkle bases his claims against Hanover are structurally complex. *See* footnote 2, *supra.* It is also true that the Homeowners Policy is especially hard to read, even after one has narrowed the study to the policy provisions that are potentially relevant to the matter in dispute. It is also true, however, that part of the seeming complexity may turn out to be irrelevant in a particular case. That is, some segments of the policy that appear on first screening to be potentially relevant may be discarded on closer examination.[3]

---

**3.** For example, we learn in the New Jersey endorsement (quoted in note 4, below) that all the "Section II–Exclusions" (apparently including those stated in the basic policy and quoted in this footnote) "do not apply to personal injury." A curious reader may nevertheless wish to read the Section II exclusions and think about whether they have any bearing on the meaning of "business pursuits" as that phrase is used in the New Jersey endorsement. The quotation here begins with "Coverages" stated in the basic policy form before proceeding to "Exclusions" stated in the basic policy form.

. **Section II–Liability Coverages**
**COVERAGE E–Personal Liability**
If a claim is made or suit is brought against an insured for damages because of **bodily injury or property damage** caused by an occurrence to which this coverage applies, we [the company] will:

 . . . . .

 2. provide a defense at our expense by counsel of our choice, even if the suit is groundless, false or fraudulent. We may investigate and settle any claim or suit that we decide is appropriate. . . .

 . . . . .

In making a closer examination of particular policy provisions invoked in arguments made by the parties in this case, one should be constantly alert to contrasts in meaning of the phrases "property damage," "bodily injury," "personal injury," "Liability Coverages," "Coverage E–Personal Liability [coverage]," "bodily injury liability coverage," "Personal Injury [liability] Coverage," and "Property Damage [liability coverage]."

"Personal liability coverage" has a broad meaning. "Bodily injury liability coverage," "personal injury liability coverage," and "property damage liability coverage" are three different types of "personal liability coverage."

Also, close reading discloses that relevant enlargements of "Section II–Liability Coverages" appear in the New Jersey Optional Endorsements, under the caption, "HO 82 (Optional) Personal Injury." [4] Here we learn that "Section II Exclusions do not apply to personal injury." [5]

I conclude that, after screening for relevance to this case, the content of the policy provisions can be summarized in the following way, certain critical passages being quoted and highlighted for emphasis.

> If a ... suit is brought against an insured for damages because of *"personal injury"* caused by an occurrence to which this coverage applies, we [the company] will provide a defense at our expense by counsel of our choice, even if the suit is groundless, false, or fraudulent.

> *"Personal injury"* means injury arising out of one or more of the following offenses:

> . malicious prosecution

> . libel, slander or defamation of character, or

> . invasion of privacy.

> Personal injury insurance does not apply to:

> . *"injury arising out of the business pursuits of an insured."*

Up to this point, the summarized policy provisions have carried us through the grant-add-withdraw steps of the drafting style.

Does the policy language also proceed through a fourth step, in which something withdrawn by the exclusion of "injury arising out of the business pursuits of an insured" is restored? Here we encounter a debatable question.

Definitely there is a clause in "Section II–Exclusions" of the basic policy telling us that "Coverage E–Personal Liability" does "not apply to bodily injury ... arising out of business pursuits of an insured...." And, definitely, that provision is followed immediately by one that partly restores: "This ex-

---

. **Section II—Exclusions**
1. **Coverage E—Personal Liability and Coverage F—Medical Payments to Others** do not apply to bodily injury ...
 a. which is expected or intended by the insured;
 b. arising out of business pursuits of an insured....
 This exclusion does not apply to:
 (1) activities which are usual to non-business pursuits; ....

. . . . . .

 c. arising out of the rendering of or failure to render professional services.

4. For an additional premium, under Coverage E—Personal Liability, the definition of bodily injury is amended to include personal injury. "Personal injury" means injury arising out of one or more of the following offenses:
 1. false arrest, detention or imprisonment, or malicious prosecution;
 2. libel, slander or defamation of character; or
 3. invasion of privacy, wrongful eviction or wrongful entry.
 Section II Exclusions do not apply to personal injury. Personal injury insurance does not apply to:
 1. liability assumed by the insured under any contract or agreement except any indemnity obligation assumed by the insured under a written contract directly relating to the ownership, maintenance or use of the premises;
 2. injury caused by a violation of a penal. law or ordinance committed by or with the knowledge or consent of an insured;
 3. injury sustained by any person as a result of an offense directly or indirectly related to the employment of this person by the insured;
 4. injury arising out of the business pursuits of an insured; or
 5. civil or public activities performed for pay by an insured.
 All other provisions of this policy apply.

5. *Id.,* following the paragraph commencing "Personal injury means...."

clusion does not apply to ... activities which are usual to non-business pursuits...."

One may argue, however, that these provisions of the basic policy are irrelevant in this case because they concern "bodily injury" and not "personal injury." With respect to "personal injury insurance" there is no grant anywhere in the basic policy. Instead, "personal injury insurance" is added in the New Jersey endorsement, and that endorsement declares that "[p]ersonal injury insurance does not apply to ... injury arising out of the business pursuits of an insured." This "does not apply" clause excludes (or withdraws, or takes away) part of the coverage added (in step two)—the "personal injury insurance."

The New Jersey endorsement does not contain a fourth-step provision purporting to restore something otherwise taken away by the "business pursuits" clause.

Should we disregard the fourth-step provision of the basic policy form and, finding no fourth-step provision in the New Jersey endorsement, conclude that no fourth-step restoration applies to "personal injury insurance" coverage?

Because of this debatable question about whether the text of the policy (that is, the basic policy and the New Jersey endorsement, taken together) contains a relevant fourth step, it is at least plausible to argue that the complex structure and drafting style make the combined Homeowners Policy and New Jersey endorsement ambiguous to the objectively reasonable reader and that Buirkle should have coverage under the Homeowners Policy because either (i) the ambiguity should be resolved against the insurer, or (ii) it was objectively reasonable for Buirkle

to believe he had coverage for defense against the New York law suit against him and that his reasonable expectation should be honored? I return to this question and its subparts in Parts VI–VIII of this Opinion.

Before proceeding to other matters, I call attention to one more characteristic of the Homeowners Policy that bears upon questions to be resolved in this case. It has a "Definitions" section, but no definition of "business pursuits." The basic policy does say, however, under the caption, "DEFINITIONS":

**2. "business" includes trade, profession or occupation.**

The Personal Catastrophe Liability Policy (Exhibit B to the Stipulation) is mercifully less complex. In one respect, however, the stipulated facts in this case presented a more puzzling question. What premium was paid for this policy? The premium is not stated in Exhibit B.

The court explicitly called attention to this gap in the evidence when suggesting in the December conference that the evidence might be reopened. A later proffer contained evidence that the total premium for Buirkle's homeowners policy was $846.00. (Eska Aff. ¶ 5, Docket No. 43, exh. B.) I have concluded, however, that I should sustain defendant's objection to the reopening of evidence bearing upon adjudicative facts. Part I.D, *supra*. Therefore I must and do disregard this evidence when finding adjudicative facts in this case.

Potentially relevant provisions of the Personal Catastrophe Liability Policy are set forth in the margin.[6] A close reading nar-

---

6.

**AGREEMENT**

This insurance policy is a legal contract between you and The Hanover Insurance Company. This policy gives you and your family extra liability protection above the coverage of your present auto, homeowners and most other policies. It does not matter whether you bought these other policies from us or other insurance companies.
This policy gives two types of extra protection to you. First, it adds to the liability limits of most of your other policies. Second, there are liabilities your other policies do not cover. Different companies have different policies,

but none of them cover the full range of all possible claims. This policy is designed to protect you against some unusual claims that are not covered by your standard policies.

⋆ ⋆ ⋆ ⋆ ⋆

This is a liability policy. It covers only somebody else's claim against you for a liability loss caused by you. It does not cover damages to your own property, such as your car, house or valuables. It does not cover injuries to you. There are two types of liability losses covered by this policy. These losses are:
**Property damage....**
**Personal injury:** Physical injuries to a person, including but not limited to death, and injuries

rows the provisions that are most significant in this case to the following (stated here in abbreviated paraphrase except as to the critical passages, which are identified by emphasis and quotation marks):

This policy gives two types of extra protection to you beyond that of your other policies. First, it adds to the liability limits. Second, there are liabilities your other policies do not cover. This policy is designed to protect you against some unusual claims that are not covered by your standard policies.

This policy covers losses from personal injury suits. "Personal injury" includes "injuries to a person's feelings or reputation." *"This includes mental injury, mental anguish, shock, libel, slander, defamation of character, invasion of privacy or false arrest, so long as these injuries are not intended by you."*

*"This policy does not cover the following types of claims: "*

*"1. We will not cover liability connected with business, profession or occupation of anyone insured,* such as malpractice claims against a doctor." ...

. . . . .

*"6. We will not cover any liability caused by acts committed by you or at your di-*

rection *which were intended to hurt people or damage property."*

Part VIII, below, examines more closely the interpretation of the emphasized passages of the Personal Catastrophe Liability Policy.

### III. *Choice of Law*

During early proceedings in this case the parties called attention to a potential issue of choice among New Jersey, Massachusetts, and New York law. At trial, however, the parties stipulated that New Jersey law is to be applied. I accept this stipulation. *See, e.g., Borden v. Paul Revere Life Ins. Co.,* 935 F.2d 370, 375 (1st Cir.1991) ("[w]here ... the parties have agreed about what law governs, a federal court sitting in diversity is free, if it chooses, to forego independent analysis and accept the parties' agreement") (citations omitted).

### IV. *The Law on Duty to Defend*

### A. *The Basic Rule in New Jersey*

Under New Jersey law, "the duty to defend is generally determined by comparing the allegations in the complaint with the language of the policy." *SL Industries, Inc. v. American Motorists Insurance Company,* 128 N.J. 188, 197, 607 A.2d 1266, 1271 (1992). "When the two correspond, the insurer must

---

to a person's feelings or reputation. This includes mental injury, mental anguish, shock, libel, slander, defamation of character, invasion of privacy or false arrest, so long as these injuries are not intended by you....

. . . . .

**PART A**

You've told us you and other members of your household have insurance policies in force with limits of liability equal to or higher than the limits of liability shown on the Declarations Page. If an insurance claim covered by this policy is also covered by one or more of your other insurance policies, we shall pay only the difference between what is payable under that policy and the sum total of what you legally have to pay. We will do this up to the limit of this policy. If your other insurance coverage at the time of the accident has lapsed or is less than the limit listed on the attached Declarations Page, we will pay only the difference between the coverage you said you had and your total liability.

. . . . .

**PART B**

Some liabilities may not be covered by any other insurance policy you have. This may happen because of gaps in your coverage or because a claim against you is so unusual that it is not covered by standard policies.

If a liability covered by this policy is not covered by another policy of yours, we will pay claims you legally have to pay up to the limit listed on the Declarations Page. We will subtract the amount you have selected to pay yourself from any amount we pay. This amount is called your retained limit and is shown on the Declarations Page of this policy. This policy does not cover the following types of claims:

1. We will not cover liability connected with business, profession or occupation of anyone insured, such as malpractice claims against a doctor....

. . . . .

6. We will not cover any liability caused by acts committed by you or at your direction which were intended to hurt people or damage property.

. . . . .

(Docket No. 31, exh. B.)

defend the suit." *Id.* When no duty arises on this basis, "facts outside the complaint may trigger the duty to defend," *id.* at 198, 607 A.2d at 1272, but only if those facts are "*known* to the insurer," *id.* at 199, 607 A.2d at 1272 (emphasis in original).

Another issue of potential relevance concerns allocation of defense costs among claims where the duty to defend applies to one or more claims asserted in the tort complaint and not to one or more others. The Supreme Court of New Jersey has recently clarified its position on this issue:

> Although we adopt the general rule favored by most jurisdictions, we note that our interpretation differs from that of a number of the courts that have applied it. Those courts presume that apportioning costs will be very difficult, and that the exception, requiring insurers to pay all of the defense costs if they are not capable of apportionment, thus applies more often than the rule requiring apportionment. *See, e.g., Crist,* ... 529 F.Supp. at 605 ("Typically,.... an apportionment of expenses ... is nearly impossible."). Those courts implicitly require a greater degree of certainty in determining the allocability of costs than is either necessary or fair. We recognize that insurers, insureds, and courts will rarely be able to determine the allocation of defense costs with scientific certainty. However, the lack of scientific certainty does not justify imposing all of the costs on the insurer by default. The legal system frequently resolves issues involving considerable uncertainty. We presume that the insurer and insured can negotiate a satisfactory settlement that fairly apportions the defense costs. When they are unable to agree, we likewise presume that our courts will be able to analyze the allegations in the complaint in light of the coverage of the policy to arrive at a fair division of costs.

*Id.* at 215–16, 607 A.2d at 1280 (footnote omitted).

**B.** *Controlling Effect in This Case of the Complaint in the Underlying Action*

 In New Jersey, as noted above, facts outside the complaint may trigger a duty to defend only if those facts are "*known* to the insurer." *SL Industries,* 128 N.J. at 198–99, 607 A.2d at 1272 (emphasis in original). There is no evidence in the record before me that Buirkle gave notice to Hanover, before or at the time of demanding that Hanover defend, of any facts outside the complaint as a basis for his claiming that Hanover had a duty to defend. Nor is there is any evidence to support a finding that Hanover learned any facts outside the allegations of the complaint in the Underlying Action that would support a duty to defend.

Also, Buirkle, even when invited by the court to proffer evidence beyond the stipulation filed by the parties, did not proffer evidence to support a finding that Hanover knew facts beyond the claims in the Underlying Action that would support a duty to defend. Thus, whether I address the matter on the stipulation only or instead on the stipulation plus the proffered evidence (despite my determination in Part I.D above that I should not receive evidence beyond the stipulation for the purpose of making findings on *adjudicative* facts), I find that there is no evidence before me of facts outside the allegations of the Underlying Action that bear upon the duty to defend.

I turn, then, to the allegations of the complaint in the Underlying Action as the basis upon which I must determine the duty to defend in this case.

### V. *The Suit*

The "suit" as to which Buirkle asserts that Hanover had a duty to defend Buirkle was brought in the Supreme Court of the State of New York by AroChem Corporation and William R. Harris against Harold W. Buirkle. The complaint (Exhibit C to the Stipulation), after describing the Parties (paras. 1–3), alleges Jurisdiction and Venue (paras. 4, 5), and alleges "Relevant Facts" in three categories—Background (paras. 6–9), The Facts Pertinent to this Action (paras. 10–13), and Defamatory Statements to the Victory Companies and Malicious Interference with Contracts and Relationships Between the Victory Companies and AroChem and Harris (paras. 14–20). The complaint then alleges four causes of action:

First Cause of Action

(Libel, Slander and Defamation with Actual Malice)

(paras. 21–25)

Second Cause of Action

(Libel, Slander and Defamation Absent Actual Malice)

(paras. 26–30)

Third Cause of Action

(Tortious Interference with Contract)

(paras. 31–34)

Fourth Cause of Action

(Tortious Interference with Business Relationships and Prospective Business Opportunities)

(paras. 35–38)

By letter of June 1, 1990, addressed to Hanover, counsel for Buirkle referred to Buirkle's two policies with Hanover (Exhibits A and B to the Stipulation in this case) and stated:

Please be advised that this office represents your insured Harold Buirkle. Recently, a complaint was served upon Mr. Buirkle, a copy of which is enclosed, *which alleges that he defamed and maliciously interfered with the business relationships of the plaintiffs.* Based on the policy provisions, Hanover Insurance Co. is obligated to provide a defense and coverage to Mr. Buirkle against these allegations. We believe that it is in the best interests of Mr. Buirkle and Hanover that this action be removed from the New York Supreme Court to the United States District Court of New York. Accordingly, we propose to file a petition for removal. This petition must be filed within thirty days of the service of the complaint upon Mr. Buirkle. Since the complaint was served on May 7, we are required to file this petition no later than June 7, 1990. Unless we receive instructions from you to the contrary by Wednesday, June 5, 1990, it is our intention to proceed with the removal. We have also sought an extension of time in which to file and prepare an answer to the complaint. . . .

Mr. Buirkle has also requested that Hanover permit this firm to continue as counsel on his behalf in this matter.

Please advise if there is any further information which is required in order to process this matter.

. . . . .

Docket No. 34, exh. D (emphasis added).

This demand letter asserted coverage only as to allegations that Buirkle "defamed and maliciously interfered with the business relationships of the plaintiffs." It offered no explanation of what specific provisions of the policy Buirkle relied upon to support his contention that Hanover had a duty to defend against these claims of defamation and malicious interference. Nor did this letter call attention to any specific paragraphs or allegations of the complaint in the Underlying Action that Buirkle relied upon.

I do not decide the duty-to-defend issue on the basis of the absence of specificity of the demand letter, however. Hanover had easy access to the complaint to obtain whatever information the complaint provided about the nature of the claims in the Underlying Action.

The complaint gave notice in the captions for the First and Second Causes of Action, quoted above, that those causes of action were for "Libel, Slander and Defamation." The captions of the Third and Fourth Causes of Action gave notice that they were for "Tortious Interference with Contract" and "Tortious Interference with Business Relationships and Prospective Business Opportunities."

I assume in Buirkle's favor that these captions in the complaint were sufficient to notify Hanover that tort claims were alleged against Buirkle for "personal injury" as that term is used in both the Homeowners Policy and the Personal Catastrophe Liability Policy.

■ Throughout this litigation, Buirkle's principal claim has been under the "personal injury" liability coverage. Recently filed submissions have added a contention of coverage under "property damage" liability coverage. That contention may be quickly dismissed, however. The policy definitions of property damage liability coverage are as follows:

"property damage" means physical injury to, destruction of, or loss of use of tangible property.

Homeowners Policy (Docket No. 34, exh. 1–A).

. Property damage: Any damage to tangible property or its loss or destruction. Also the loss of its use. But only if the damage, loss or destruction or loss of use is not intended by you.

Personal Catastrophe Liability Policy (Docket No. 34, exh. 1–B).

No claim was made against Buirkle in the Underlying Action for damage to tangible property or for loss of use of tangible property. That is enough to end the matter. *Cf. Voorhees v. Preferred Mut. Ins. Co.*, 128 N.J. 165, 607 A.2d 1255, 1259 (1992) (noting that "[w]hether an insurer has a duty to defend is determined by comparing the allegations in the complaint with the language of the policy," and observing, furthermore, that "[t]he duty to defend, ..., is determined by *whether* a covered claim is made, not by how well it is made") (emphasis in original).

In the alternative, however, even if I assume also in Buirkle's favor a more dubious proposition that one or more of the Causes of Action was for "property damage," Buirkle's assertion that Hanover had a duty to defend faces another hurdle, which applies also to Buirkle's assertion of "personal injury" liability coverage.

Buirkle loses in this case if the "Causes of Action" alleged in the complaint disclose on the face of the complaint no basis for an objectively reasonable contention by Buirkle that one or more of the claims was outside the meaning of the following provisions:

(i) in the Homeowners Policy, the provision declaring that "[p]ersonal injury insurance does not apply to ... injury arising out of the business pursuits of an insured," and

(ii) in the Personal Catastrophe Liability Policy, the provision declaring that "[w]e will not cover liability connected with business, profession or occupation of anyone insured, such as malpractice claims against a doctor...."

I now summarize additional details of the complaint in the Underlying Action that might arguably bear upon whether the complaint states a claim not within the scope of these exclusions.[7]

The complaint in the Underlying Action describes Buirkle as a person who at all relevant times lived in New Jersey; worked in New York, doing business in New York as managing director of Henley; and, in addition, "transacted business in New York relating to matters involving AroChem and Harris." Underlying Action, Complaint ¶ 3.

According to the factual allegations of the complaint, Buirkle had a close business relationship with a third person, Wells, who had an ownership interest in AroChem. Beginning in February 1988 and extending into 1989, Wells became increasingly interested in expanding his ownership interest in AroChem and came increasingly into conflict with Harris, who also had an ownership interest in AroChem. Wells developed a malicious scheme to defame Harris and interfere with Harris' relationship with AroChem. Wells enlisted Buirkle to join in the scheme. Buirkle, in view of his business connections with Henley, had the ability to assist Wells with financing. By no later than October 1989 Buirkle agreed personally to assist Wells with financing in exchange for Buirkle's personal participation in the ownership of AroChem if Wells succeeded in the scheme. Buirkle also provided business advice to Wells and assisted Wells in defaming Harris and interfering with Harris' relationship with AroChem and with Harris' and AroChems' relationship with the Victory Companies. *See* Docket No. 34, exh. C, pp. 1–10, 13–14.

The complaint cannot reasonably be interpreted as asserting, even in the alternative, a claim against Buirkle for any tort not connected with Buirkle's activities associated with aiding Wells in efforts to obtain a larger share of ownership in Arochem through activities extending over a period of months at the least.

---

7. Portions of the complaint from which this summary is drawn are quoted in the Appendix.

Because of the conclusion reached in Parts VI–VIII below, I need not and do not consider whether the complaint may reasonably be interpreted as alleging in the alternative a claim outside the scope of policy exclusions for intended injuries.

## VI. *"Business Pursuits," "Connected With Business," and "Activities Usual to Non–Business Pursuits"*

For the reasons explained in Parts IV and V, I conclude that, to determine whether Hanover had a duty to defend Buirkle in the Underlying Action in this case, I must compare each of the claims alleged in the Underlying Action with the coverage provisions of the two policies. More precisely, in the particular circumstances of this case, as explained in Parts IV and V, the purpose of the comparison is to determine whether in the Underlying Action some claim is alleged against Buirkle that is not taken out of the scope of coverage

(i) of the Homeowners Policy, by the provisions declaring that "[p]ersonal injury insurance does not apply to ... injury arising out of the business pursuits of an insured," and

(ii) of the Personal Catastrophe Liability Policy, by the provision declaring that "[w]e will not cover liability connected with business, profession, or occupation of anyone insured, such as malpractice claims against a doctor...."

### A. *Differing Policy Provisions and Conflicting Precedents*

#### 1. *Impediments to Determining the Weight of Precedent*

For four interconnected reasons, it is difficult, if not impossible, to determine the weight of precedents, both in New Jersey and elsewhere, as they might be applied to the issues in this case. The four reasons are:

First, policy clauses using the phrase "business pursuits" have varied widely in their text and in their literal contexts (that is, in the organization, structure, and text of associated clauses of each policy).

Second, the factual circumstances of the cases before the courts have varied widely.

Third, few of the opinions disclose explicitly the full text and literal context of the "business pursuits" clause or the "connected with business, profession or occupation" clause before the court.

Fourth, even fewer opinions draw comparisons or contrasts between the clauses before them and the clauses before other courts in other cases. *See, e.g.,* Job A. Sandoval, Annotation, *Construction and Application of "Business Pursuits" Exclusion Provision in General Liability Policy,* 48 A.L.R.3d 1096 (1973 & Supp. 1992) (collecting cases).

In general, one strong tendency of the decisions is to find ambiguity and resolve it against the insurer—that is, resolve it in favor of coverage, regardless of whether the text at issue was part of a grant of coverage, an exclusion from coverage, or a carve-out from an exclusion. 7C John A. Appleman, *Insurance Law and Practice* § 4684.01 (Walter F. Berdal ed., 1979).

Of course, this tendency is not necessarily unprincipled. The organizing principle may be that a genuine and material ambiguity is resolved against the insurance company, regardless of the type of clause in which it appears. The applicability of this principle depends entirely, however, on the existence of a genuine and material ambiguity.

#### 2. *Zones of Clarity and Uncertainty About What Activities are "Business Pursuits"*

■ Before crediting a legal argument based on alleged ambiguity of an insurance policy provision, or one based on an alleged expectation about the scope of the insurance coverage it provides, a court must screen for relevance. That is, an alleged ambiguity or expectation is of no consequence unless it concerns an issue relevant to disposition of the case before the court.

■ For example, an identified ambiguity about the meaning of "business pursuits" helps the claimant (Buirkle, in this instance) only if the circumstances of the claim present a dispute within the zone of that identified ambiguity. Even though no bright line exists to separate activities we describe as

"business pursuits" from those we describe as "not business pursuits" (or "non-business pursuits," a phrase that does not necessarily mean the same thing as "not business pursuits"), some activities plainly are business pursuits and others plainly are not.

A perceptive observer sees a material difference between the light of day and the dark of night, and knows that difference to be a reality even though the two are separated not by a bright line but by a zone of twilight. So, too, zones of clarity exist, at each end of the spectrum, about whether human experiences are or are not business pursuits. Ambiguity within the zone of twilight in between, and ambiguity at the edges of the twilight zone, about the meaning of the phrases "business pursuits" and "not business pursuits" (or "non-business pursuits") help Buirkle's claim only if the activities described in his claim fall within the zone of ambiguity. (This is true whether we define the policyholder's activities by the allegations of the tort claim against him, as I have concluded we must do in this case, or instead by the evidence he proffers as to what his activities actually were.)

If, instead, Buirkle's activities fall within the zone of clarity that supports his claims, he wins without relying on ambiguity. If, on the other hand, his activities fall within the opposite zone of clarity, he loses. In either event, the ambiguity of the policy language is simply irrelevant to the dispute before the court.

■ Similarly, the doctrine of honoring reasonable expectations applies only if what Buirkle asserts as a reasonable expectation of coverage concerns coverage for activities of a type falling within the twilight zone of uncertainty rather than within one of the zones of clarity at either end of the spectrum for activities that clearly are business pursuits, or clearly are not. Otherwise, he wins in any event, or loses in any event, and the reasonable expectations doctrine is irrelevant to the case.

### B. A Reverse Spin on "Business Pursuits"; The Sinopoli Case

Each of the parties has invoked as a decision allegedly in its favor *Sinopoli v. North*

*River Insurance Company*, 244 N.J.Super. 245, 581 A.2d 1368 (1990), *cert. denied,* 127 N.J. 325, 604 A.2d 600 (1991). Their respective efforts fail because in that case the court was interpreting the meaning of "business pursuits" where used in an insurance policy with a reverse spin. That spin contrasts with the more common usage, and the usage in the Homeowners Policy at issue here. In *Sinopoli,* an "exclusion" from the "personal liability coverage" of a Homeowners Policy declared that the policy did not

cover any loss under its personal liability coverage

For bodily injury or property damage

. . . .

3. Arising out of any business activities of an insured, except:

. . . .

b. Those within the term business pursuits; . . . .

244 N.J.Super. at 249, 581 A.2d at 1369–70.

Rather than denying coverage for injury arising out of "business pursuits" as the Homeowners Policy at issue here does, the "except . . . business pursuits" clause of the policy before the court in *Sinopoli,* as reported in the court's opinion, restored coverage for "bodily injury" that would otherwise have been taken away by the "exclusion" of "bodily injury . . . [a]rising out of any business activities of an insured. . . ."

Moreover, the inapplicability of *Sinopoli* as an aid to determining the meaning of "business," "business pursuits," and "connected with business, profession or occupation" as used in the two policies at issue here is underscored by the fact that both "business" and "business pursuits" were defined in the *Sinopoli* policy, and defined in a rather distinctive way. "Business" was defined as including "a trade, profession or other occupation (including farming) and use of any premises for such purposes." 244 N.J.Super. at 251 n. 1, 581 A.2d at 1371 n. 1. The distinctive definition of "business pursuits" that the *Sinopoli* policy supplied in its glossary declared that the term "means," among other things:

1. occupation as a clerical office employee, including executives whose activities are limited to clerical office work; and

2. occupation as a sales person, cashier or messenger—but not those engaged in installation, demonstration, or servicing....

244 N.J.Super. at 249, 581 A.2d at 1370.

I conclude that the distinctions among occupations in clause 2 of the *Sinopoli* policy are not implicit in the objectively manifested meaning of

(i) the phrase "business pursuits" in an insurance policy that does not contain any definition of "business pursuits" and is "written in plain English," or

(ii) the phrase "business, profession or occupation" in an insurance policy that does not contain a definition of this phrase and is "written in plain English."

 In determining the meaning of any term used in a policy, a court must, of course, look first to the policy definition itself, if there is one. · ·

Thus, for example, the meaning of "business pursuits" as used in a policy defining it in a special way, for use to restore coverage otherwise taken away by an "exclusion" of "bodily injury ... arising out of any business activities," is not helpful in determining the precise meaning of the *exclusion* of coverage for "business pursuits" in the Homeowners Policy at issue here.

## C. *Other Precedents*

In search of guidance as to how the highest court of New Jersey would interpret and apply (i) the "business pursuits" clauses of the Homeowners Policy and (ii) the Clause of the Personal Catastrophe Liability Policy using the phrase "connected with business, profession or occupation of anyone insured," we must look for analogies in New Jersey precedents and for precedents or analogies in the law of other jurisdictions that might be persuasive to the New Jersey court.

I conclude that, both in New Jersey and in American law generally, precedents have established two zones of clarity at the polar extremes. In these zones of clarity, precedents require a court to rule "as a matter of law" on one hand, that a claim of the type before the court is for an injury arising out of "business pursuits" (or is "connected with business, profession or occupation"), or, on the other hand, that a claim of the type before the court is not for an injury arising out of "business pursuits" (or is not "connected with business, profession or occupation"). In between these zones of clarity is a large zone in which a court must determine an issue of first impression—that is, decide a case the outcome of which depends upon an issue of law as yet undecided.

A court deciding an issue of first impression in this indeterminate zone might expand one of the zones of clarity, or might determine that ambiguity exists and that the policyholder (insured) should have coverage because the ambiguity must be resolved in the policyholder's favor or because the policyholder had a reasonable expectation of coverage that must be honored.

The first step to deciding this case is to determine whether any of the claims against Buirkle in the Underlying Action is either in the zone of coverage established by precedents, or at least is in the zone yet undecided (in which case an issue of first impression must then be addressed). If none of the claims against Buirkle is in either of these zones, his claim that Hanover had a duty to defend lacks merit.

The precedents may be usefully analyzed from two separate perspectives:

(i) What factors have precedents approved as matters a court is to consider in deciding whether an injury is one arising out of "business pursuits"?

(ii) What was each fact pattern that a court ruled to be within coverage, outside coverage, or in a zone of uncertainty by reason of which the court invoked a rule of resolving ambiguity against the insurer or a rule of honoring reasonable expectations of the policyholder?

## 1. *Factors*

Illustrative of pronouncements about factors are opinions that focus upon the non-exclusive list of categories below. In each category, New Jersey court opinions, if any, are listed first:

(i) *Profit motive.* *E.g. Sun Alliance Ins. Co. of Puerto Rico, Inc. v. Soto,* 836 F.2d 834, 836 (3rd Cir.1988) (profit motive may be shown by such activity as a means of livelihood, a means of earning a living, procuring subsistence or profit, commercial transactions or engagements); *See also Travelers Indemnity Co. v. Fantozzi,* 825 F.Supp. 80, 84 (E.D.Pa.1993) (citing *Sun Alliance* ); *In re San Juan Dupont Plaza Hotel Fire Litigation,* 789 F.Supp. 1212, 1219 (D.P.R.1992) (construing California law; collecting cases from various jurisdictions); *State Farm v. Hiermer,* 720 F.Supp. 1310, 1315 (S.D.Ohio 1988), *affirmed* 884 F.2d 580 (6th Cir.1989); *Becker v. State Farm,* 664 F.Supp. 460, 462 (N.D.Cal.1987); *Horace Mann v. Combs,* 626 F.Supp. 354, 357 (S.D.Iowa 1986). *But see American Family Mut. Ins. Co. v. Nickerson,* 813 F.2d 135, 136 (8th Cir.1987) (under Missouri law, profit motive is irrelevant to business pursuits determination when the questioned conduct is incidental to insured's regular employment). *See also* Job A. Sandoval, Annotation, *Construction and Application of "Business Pursuits" Exclusion Provision in General Liability Policy,* 48 A.L.R.3d 1096, 1101 & 1992 Supp. at 103 (1973).

(ii) *Degree of continuity (on a regular, irregular, single act continuum).* *E.g., Travelers Indemnity Co. v. Fantozzi,* 825 F.Supp. 80, 84 (E.D.Pa.1993) (married couple's babysitting activities that took place on a daily basis over the course of more than four years were determined to be excluded business pursuits); *Becker v. State Farm,* 664 F.Supp. 460, 462 (N.D.Cal.1987) (concluding that although the purchase of a movie theater was a one-shot deal, it was to be an ongoing business, and was therefore, an excluded business activity; *Horace Mann v. Combs,* 626 F.Supp. 354, 357 (S.D.Iowa 1986) (insured co-owner of pontoon boat did not engage in excluded business pursuit even though co-owner rented boat and earned profits therefrom; there was no partnership agreement between the co-owners, and

insured earned no profit from the rental); *State Farm Fire & Casualty Co. v. Drasin,* 152 Cal.App.3d 864, 869, 199 Cal.Rptr 749 (1984) (insureds' limited partnership interest in mining leases was a business pursuit, even though one of the insureds was an attorney by profession). *See also* Sandoval, Annotation, 48 A.L.R.3d at 1100–01 & 1992 Supp. at 101–03).

(iii) **Multiple Non-investment Activities (part-time business pursuits versus hobbies).** *E.g., compare Stern v. Insurance Co. of North America,* 62 N.J. 582, 303 A.2d 883 (1973) (insured engaged primarily in trucking and warehouse business, serving as elected director of local bank, had attended eight meetings when bank became insolvent; shareholders' claim for breach of duties of fidelity and diligence was within "business pursuits" clause and therefore outside scope of coverage of a personal excess liability policy) *with Pacific Indem. Co. v. Linn,* 766 F.2d 754, 766 (3rd Cir.1985) (construing Pennsylvania law; professional service exclusion and business enterprises exclusion found to be ambiguous; "Dr. Linn's writing of the book did not constitute his business, although a profit motive cannot be denied.... [Doctor] simply co-authored a diet book. This authorship did not connote a "business" in terms of an ongoing operation with assets owned by Linn.") *and with Southern Guaranty Insurance Company v. Duncan,* 131 Ga.App. 761, 206 S.E.2d 672 (1974) (business pursuits did not include spare time racing interest of insured, who was gainfully employed as a mechanic).

*See also Burdge v. Excelsior Ins. Co.,* 194 N.J.Super. 320, 323–24, 476 A.2d 880, 883 (1984) (court draws distinction between business pursuits and constitutionally protected political activity, concluding that campaign activities of an office seeker, even if an incumbent, do not constitute business pursuits).

*See also* 7A John A. Appleman, *Insurance Law and Practice,* § 4501.10 (Berdal ed.) ("The business activity need not be the sole occupation, and part-time business activities are excluded....").

(iv) *Investment Activity (minimal or "hobby" to major; active or passive investor).* E.g., *In re San Juan Dupont Plaza Hotel Fire Litigation,* 789 F.Supp. 1212 (D.P.R.1992) (holding that investment activities at issue were "easily distinguishable from spare time pursuits such as hobbies or leisure activities"); *Lumbermen's Mutual Casualty Co. v. United Services Automobile Association,* 218 N.J.Super. 492, 528 A.2d 64 (1987) (practicing psychiatrist, with friends, established several health clubs, of which he was president, but not involved in daily management; when club failed, he allegedly made, in interview with reporter, defamatory statements about management; trial court determined no coverage on alternative grounds of lack of coverage for defamation and applicability of "business pursuits" exclusion; appellate court affirmed on first ground and did not reach "business pursuits" exclusion).

## 2. Fact Patterns

Reexamining the precedents from the perspective of identifying the fact patterns before the courts in decided cases one may conclude, in general, though with possible differences among courts at the margins, that two zones of clarity have been established.

First, coverage has been allowed, despite a "business pursuits" exclusion, when the activities alleged to be business pursuits involved a single or a small number of instances and a very small part of the insured's total time committed to making earnings or profits.

E.g., *Solomon v. Continental Ins. Co.,* 122 N.J.Super. 125, 299 A.2d 413 (1972) (insured husband and wife were found not to have engaged in business pursuits in connection with for-profit gun dealership conducted by non-resident son in outbuildings of parents' residential premises; due to ambiguity of exclusion clause insurer could not deny coverage for claim asserted against insureds by fireman who was injured when gunpowder stored in outbuilding exploded during fire); *Southern Guaranty Insurance Company v. Duncan,* 131 Ga.App. 761, 764, 206 S.E.2d 672, 674 (1974) (insured, who was gainfully employed as a mechanic, enjoyed a spare time racing interest; neighbor was injured by stray piece of metal while insured was working on a vehicle that the insured had adapted for racing; business pursuits exclusion did not apply).

Second, coverage has been denied when the activities alleged to be business pursuits continued over a period of years and occupied a substantial part of the insured's total time committed to making earnings or profits.

E.g., *Stern v. Insurance Co. of North America,* 62 N.J. 582, 303 A.2d 883 (1973) (insured engaged primarily in trucking and warehouse business, serving as elected director of local bank, had attended eight meetings when bank became insolvent; shareholders' claim for breach of duties of fidelity and diligence was within "business pursuits" clause and therefore outside scope of coverage of a personal excess liability policy); *Sun Alliance Ins. Co. of Puerto Rico, Inc. v. Soto,* 836 F.2d at 835–36 (3rd Cir.1988) (exclusion applied to claims against insured arising from fire in commercial property owned by corporation of which insured was sole shareholder and president, where: corporation paid salary, insured owned and operated corporation at a profit, and apartment complex owned by corporation, in which insured was tenant, had been operated by insured for approximately twenty years).

With these observations about the state of precedents as background, I turn next to applying the guidance from precedents to the particular circumstances presented by this case. Part VII considers the "business pursuits" clause of the Homeowners Policy. Part VIII considers the "business, profession or occupation" clause of the Personal Catastrophe Liability Policy.

## VII. Applying the "Business Pursuits" Clauses of the Homeowners Policy to the Circumstances of This Case

### A. Historical and Evaluative Facts ("Premise Facts") Regarding Ambiguities, Reasonable Expectations of Coverage, and Premium Rates

A Homeowners Policy is designed as a package policy suitable for the great majority

of homeowners. *See, e.g., Worcester Ins. Co. v. Fells Acres Day School, Inc.*, 408 Mass. 393, 412, 558 N.E.2d 958 (1990) ("[T]he manifest design of homeowners' insurance is to protect homeowners from risks associated with the home and activities related to the home.") (citation omitted). *See also* 7A John A. Appleman, *Insurance Law and Practice* § 4501.02 (Berdal ed., 1979) ("This type of coverage is simply a combination of the many property and liability coverages desired by the average person."). It is designed to supplement, not supplant, other policies available on the market. *Id.* Typical among the others are motor vehicle policies (private and commercial), professional liability insurance policies, and specialized policies of numerous kinds (for example, policies covering a farm or farms the homeowner owns for recreational or farming purposes, boats owned for recreation, and other recreational vehicles). *Id.; id.* (1992 Supp.).

Before the first Homeowners Policy was fashioned in the 1950s, nearly all the coverages now included in the package called a Homeowners Policy were available on the market. Reductions of total premium costs to the policyholder as well as marketing advantages for the insurer made the Homeowners Policy an immediate success in the market.

Any particular homeowner is likely to find in the package some coverages for which that homeowner has no need. Yet, when priced within the constraints of rate regulation (some form of which is in effect in every state) the policy package is still a good bargain for the vast majority of homeowners. For each of them, buying a package that pools all these different risks works out fairly and less expensively than buying all the separate policies that the particular homeowner would need. Each of the risks included in the package for which any particular policyholder has no need is in general unlikely to materialize in a large sum of losses payable to other policyholders. Thus, the risks irrelevant to the particular homeowner do not increase premium charges enough to offset the savings (to policyholders and their insurers) from the greater efficiency of marketing a package policy rather than many separate policies. A well-designed package policy serves principles of both fairness and economic efficiency. *See generally* Emmett J. Vaughn, *Fundamentals of Risk and Insurance* (5th ed.1989); John E. Pierce, *Development of Comprehensive Insurance for the Household* (1958) (describing the history of development of Homeowners Policy).

Coverage for business pursuits (or business activities), without limitations, would be incompatible with both fairness and efficiency in the marketing of Homeowners Policies. *See, e.g., Grossman v. American Family Mut. Ins. Co.*, 461 N.W.2d 489, 495 (Minn. App.1990) (and authorities therein). If an insurance company tried to charge the great mass of homeowners (let us say the 80% who are least involved in high-risk activities), the same premiums as it charged, let us say, that 5% of homeowners most involved in "business pursuits" (some of this 5% being engaged in high-risk, high-stakes, aggressive investment activities entirely apart from their primary business, profession, or occupation) that company could not succeed in the marketplace. Competitors would offer lower rates to the 80% of the pool whose predicted losses would be very much lower than those of the high-risk 5%. Competitors could do so because the administrative and marketing costs of identifying and pricing the different risk pools separately would fall far short of offsetting all the savings in claims costs. Even after taking account of administrative and marketing costs, competitors could attract these members of the pool with lower rates.

The competitors could, of course, also effectively advertise their rates as fairer. Charging the same rates to both the 80% low-risk group and the 5% high-risk group could be described as creating a rate structure that caused the 80% group to "subsidize" the 5% group, who might also be described as tending to be the wealthier, at least until their high-risk activities put them into bankruptcy absent this "subsidy" through inequitably rated Homeowners liability coverage. *See generally* Herbert S. Denenberg *et al., Risk and Insurance* (2d ed. 1974).

This is a brief summary of the history of development of Homeowners Policies, the nature of the package of coverages they typically contain, and the relationships among the risks included, the premiums charged, and the prevalence of state rate regulation.

Although I have cited some appellate opinions and the *Appleman* treatise on insurance *law* in support of parts of this statement, the statement is nevertheless one of "facts"— partly "historical facts" about when and how Homeowners Policies came into existence, and partly "evaluative facts" about why the Homeowners Policy swept the market and continues to maintain and perhaps even improve its position in the market.

All these facts—both the "historical" and the "evaluative"—are relevant to the decision of this case because they bear upon issues of law about the meaning of insurance policy provisions that must be decided to determine the outcome of this case. They are "premise facts"—facts that serve as premises for deciding issues of law. They are facts that may have been implicit premises of some of the precedents cited in this Opinion, and facts that are useful as premises for predicting how any legal issues of first impression in this case will be resolved by higher courts to which a losing party might appeal, or for determining how the highest court of a state whose law is being applied would decide the case. For these reasons, a court faced with the need to determine facts of this kind— "premise facts"—may consider reliable information from sources outside the record (especially when, as here, the record consists mostly of a stipulation that is entirely silent on these matters). *See, e.g., Dunagin v. City of Oxford, Miss.*, 718 F.2d 738, 748 n. 8 (5th Cir.1983) (noting that a higher court cannot be bound by two expert witnesses called by the parties and the "findings" of a trial judge) and cases cited; *Premise Facts*, 73 Minn.L.Rev. at 31–32.

It is nevertheless important that the parties have full opportunity to address these fact questions and call the court's attention to other sources of information bearing upon any of the proposed premise-fact determinations on which the court may rely in deciding the case. For that reason, I took the initiative in this case of reopening the evidence to allow the parties to submit additional evidence, if they chose, regarding premiums charged for the basic policies and for endorsements and regarding the availability in the market of one or more forms of "business pursuits" coverage.

In response to this invitation, defendant Hanover submitted the affidavits of (1) Michael Rodman of J.H. Albert International Insurance Advisors, Inc., and (2) Catherine Eska of the Hanover Insurance Companies (Docket No. 43, Offer of Proof, exhs. A and B). Plaintiff Buirkle submitted the affidavits of (1) Kenneth L. Brevich, an assistant vice president and the personal lines manager for Kaler, Carney, Liffler & Co., Inc., and (2) Francis X. Gilbert, a member of the board of directors and senior vice president of Kaler, Carney, Liffler & Co., Inc. (Docket No. 46, Counter–Offer of Proof, exhs. 1 and 2).

During the hearing at which the affidavits were offered and received, each party made objections to parts of the affidavits proffered by the opposing party. Some of the objections were sustained because of lack of any showing of personal knowledge of asserted observable facts and because of lack of qualifications or lack of foundation for proffered opinions. Other objections were reserved.

As to the reserved objections, I have determined that I need not resolve them. They are moot because, as factfinder, I find that the challenged evidence would make no difference in findings recited in this Opinion, which are the only findings I have determined to be relevant to disposition of this case.

As to the premise-fact determinations recited in this Opinion and determined to be relevant to disposition of this case, in the end it was necessary for the court, in order to arrive at determinations of fact recited in the foregoing summary, to go outside the record and consider a body of information set forth in published appellate opinions and in articles and treatises on insurance and insurance law.

In these circumstances, in order to assure sound and fair disposition of this case, I will allow the parties another opportunity to call attention to reliable information, published in

opinions, treatises, articles, or elsewhere, if they wish to challenge the accuracy of any of the determinations of fact recited in this summary.

## B. *Adjudicative Facts*

██ I find that the activities alleged in the Underlying Action, on which Buirkle relies as the basis for his claim of liability insurance coverage under the "personal injury [liability] insurance" of the New Jersey Homeowners Policy, are well within the zone of clarity of meaning of "business pursuits" as that phrase is used in the policy.

I find also that these activities are not "activities which are usual to non-business pursuits." (Having made this finding, I conclude that I need not consider further the debatable question (noted in Part II.A.3 above) whether the fourth-step carve out of the basic Homeowners Policy applies in any way to the "personal injury [liability] insurance" that is added by the New Jersey endorsement.)

These are adjudicative findings of fact. They are based in part on the stipulation of the parties as to historical facts. Although each party has argued that on the stipulated facts I should order judgment for that party, I conclude instead that it is appropriate to make an evaluative finding of fact as to this question: Do the activities the tort claimant alleged that Buirkle engaged in fall within the twilight zone between things that clearly are business pursuits and things that clearly are not? I find that they do not and that, instead, Buirkle's activities (as alleged by the tort claimant) are "business pursuits" and are not "activities which are usual to non-business pursuits."

Perhaps the answer to the question is so clear that reasonable finders of fact could not disagree and that a court should rule as a matter of law in this instance. I need not address that question, however, in view of the adjudicative findings of fact just stated.

As explained in Part V above, Buirkle's activities as described in the Underlying Action were ongoing, aggressive, participation with Wells in high-stakes efforts to gain a larger share of ownership of a very large business enterprise. They were well within the meaning of "business pursuits" and are not "activities which are usual to non-business pursuits" as those phrases are used in the Homeowners Policy.

## VIII. *The Personal Catastrophe Liability Policy*

██ I conclude that

"connected with business, profession or occupation of anyone insured, such as malpractice claims against a doctor ..."

is a very much narrower exclusion than

"injury arising out of the business pursuits of an insured...."

Nevertheless, I conclude that high-risk, high-stakes, ongoing business investment activities are "connected with business" of the insured, even though not connected with his profession or with his principal occupation if he is, for example, a dentist, physician, or lawyer.

A professional does not (or at least does not reasonably) expect liability coverage for claims arising from his investment activities to be covered by his professional liability insurer. So long as his investment activities are unusual and relatively passive, a professional may reasonably expect them to be covered by a Personal Catastrophe Liability Policy when it contains no "business pursuits" exclusion and instead contains this "connected with business" clause. But investment activities of the kind alleged against Buirkle in the Underlying Action are a different matter.

It follows that in order to determine whether Buirkle has coverage for any of the costs of defending the tort suit I must determine whether the tort suit alleges one or more causes of action for liability of Buirkle arising from activities of Buirkle that were "connected with [Buirkle's] business, profession, or occupation."

Again (as with "business pursuits," *see* Part VI.A.2, *supra*), there is a twilight zone of uncertainty between zones of activities that clearly are "connected with [a policyholder's] business" and activities that are not.

I conclude that it is an adjudicative fact question whether the tort suit is based on

activities of Buirkle that are "connected with [Buirkle's] business, profession, or occupation," and perhaps one on which finders of fact could reasonably differ. I need not and do not, however, discuss more extensively whether this is an adjudicative fact question as to which finders of fact might reasonably differ on the evidence before me. Addressing the question as one of adjudicative fact, I find that the activities of Buirkle as described in the complaint in the Underlying Action were high-risk, high-stakes, ongoing business activities. They were "connected with business" in which Buirkle was engaged on an ongoing basis. Even though not alleged to be a part of his activities as managing director of Henley, they were part of his "transact[ing] business in New York relating to matters involving AroChem and Harris," Underlying Action, Complaint ¶ 3, and continued, in aid of and association with Wells, and in support of Wells' alleged scheme to expand his ownership interest in AroChem and to defame Harris to accomplish that objective. Of course, I do not find that these allegations in the Underlying Action were well founded. Buirkle's defense in the Underlying Action was successful. What I do find is that the only claims made against Buirkle in the Underlying Action were claims based on alleged activities "connected with business" of Buirkle. Those claims are not within the scope of Buirkle's liability coverage, even with respect to the duty to defend.

## INTERLOCUTORY ORDER

For the reasons explained in the Opinion of this date, it is ORDERED:

Each party may file, on or before August 24, 1993, a submission calling attention to any basis for challenging any of the determinations of premise facts recited in the court's Opinion. If either party files such a submission, the opposing party may file a response to it on or before August 31, 1993. If any submission is filed as permitted by this paragraph, further oral argument will be heard on September 1, 1993, at 3 p.m.

## *APPENDIX*

Portions of the complaint in the Underlying Action that might arguably bear upon whether the complaint states a claim not within the scope of these exclusions are as follows:

### *PARTIES*

1. Plaintiffs AroChem International, Inc. and AroChem Corporation (collectively, "AroChem") are both incorporated under the laws of the State of Delaware. AroChem was formed in 1987 to engage in the petrochemical and petroleum business and, among other things, owns and operates oil refinery and processing facilities in Ponce, Puerto Rico.

2. Plaintiff William R. Harris ("Harris"), a resident of Connecticut, founded and has been the President, the Chief Executive Officer, a director and majority shareholder of AroChem from the time of inception to the present.

3. Defendant Harold W. Buirkle ("Buirkle") resides in Leonia, New Jersey. Buirkle has been at all relevant times a managing director of The Henley Group, Inc. ("Henley"), works in New York, is doing business in New York, and performs services at his office in New York, New York. In addition, Buirkle transacted business in New York relating to matters involving AroChem and Harris.

* * * * *

### *RELEVANT FACTS*

#### Background

6. Beginning in February 1988, Edwin E. Wells, Jr. and two wholly-owned shell entities Stetson Capital Corporation and Stetson Petroleum and Petrochemical Ventures, Inc. (collectively, "Wells") entered into certain agreements with Harris and AroChem. Pursuant to these agreements, Wells has claimed ownership of AroChem shares, a position of financial advisor to AroChem, and a position as director of AroChem. Harris, who initially owned all of AroChem, provided Wells with AroChem shares and a seat on the board of directors, and relied on Wells for financial advice.

7. Wells simultaneously purported to advise a group of affiliated entities includ-

ing Victory Oil Company, Victor Holding Company and the Crail Fund (collectively, the "Victory Companies"), who provided $17.3 million in short term financing to AroChem. Wells claims that the Victory Companies, pursuant to various agreements, are entitled to certain AroChem shares and two director seats. Wells claims further that he has certain rights to the shares to which he claims the Victory Companies are entitled.

8. In early 1989, Wells groundlessly began to claim that he was entitled to control over 90% of AroChem shares, notwithstanding the fact that he has provided no more than $100,000 of his own funds to AroChem. AroChem has obtained, over just a few years of existence, financing in excess of $250,000,000 to conduct its operations.

9. In July 1989, Harris filed an action in the United States District Court for the District of Connecticut, asserting that Wells has violated federal securities and racketeering laws, abused his positions of director and financial advisory, and committed other wrongs in a self-dealing campaign to gain control of AroChem or to force a sale of AroChem. The complaint seeks an adjudication that Wells and the Victory Companies are not entitled to AroChem shares or their positions as directors, and damages including the return of over $1 million in fees paid by AroChem for Wells's purported advisory services. In August 1989, Wells filed an action in the United States District Court for the District of Connecticut against AroChem and AroChem's management, including Harris. The Victory Companies have also commenced an action in the United States District Court for the Central District of California against Wells.

### The Facts Pertinent to this Action

10. Wells has engaged in a malicious and vicious scheme to defame Harris and AroChem and to interfere with Harris's and AroChem's business and contractual relationships. Wells has, directly or through his agents, falsely and maliciously

accused Harris and AroChem of engaging in fraudulent and criminal activity. Wells's purpose is to ruin Harris's and AroChem's reputation, to impugn their integrity and honesty, and to shatter their current and prospective business and/or contractual relationships with various third parties. Claims relating to the conduct by Wells are being pursued in the action against Wells already pending in the United States District Court for the District of Connecticut.

11. In furtherance of his scheme to ruin and defame Harris and Arochem, and to interfere with the business and contractual relationships of Harris and AroChem, Wells has enlisted the active assistance of defendant Harold W. Buirkle. Buirkle has been at all relevant times a managing director of Henley. Henley is a firm located in New York that at one time considered assisting Wells with financing to buy an interest in AroChem and participating in a joint venture with Wells to attempt to acquire ownership and control of AroChem. Henley has indicated that it no longer is involved in financing any acquisition by Wells or joint venture with Wells. However, Buirkle has individually determined to provide financing to Wells and to join Wells in a scheme to force a sale of AroChem or to wrest control of AroChem from Harris.

12. By no later than October 1989, Buirkle agreed personally to assist Wells with financing in exchange for a participation in the ownership of AroChem if Wells succeeded in acquiring complete ownership of AroChem from Harris and the Victory Companies. In furtherance of their scheme Buirkle has also provided business advice to Wells, consulted with Wells, and acted in concert with Wells, in defaming Harris and AroChem and tortiously interfering with the business and contractual relationships of Harris and AroChem. Buirkle's activities in connection with Harris and AroChem have taken place in New York and elsewhere.

13. In order to maximize the damage their actions would cause to AroChem and to Harris, Wells and at significant times Buirkle have made or caused others to

make defamatory statements—statements which Wells and Buirkle knew were untrue when made or recklessly disregarded whether they were true or not. The defamatory statements were made to the entities with which AroChem and Harris maintain critical business and contractual relations, and upon which AroChem depend heavily in the conduct of its daily operations and in pursuit of its business plans. Hence, these statements were made to virtually every source of substantial financing to AroChem, including Chase Manhattan Bank, N.A. and Chase Manhattan Bank of Puerto Rico, Drexel Burnham Lambert, Inc. and Drexel Burnham Lambert Trade Finance, Inc., the Government Development Bank for Puerto Rico, and the Victory Companies. This Complaint focuses on the activities of Buirkle with respect to the contractual and business relationships of Harris and AroChem with the Victory Companies and defamatory statements concerning Harris and AroChem made to the Victory Companies.

. . . . .

15. After the November 1989 Agreement was signed but prior to the closing, Harris and the Victory Companies provided Wells with a copy of the agreement. Wells was alarmed that, if the agreement closed, Harris would own the Victory Companies' interest in AroChem and would immediately gain control of a majority of the directors on the AroChem Board. Harris's acquisition of the Victory Companies' interest would have strengthened Harris's ability to thwart Wells's and Buirkle's scheme to secure control of AroChem, and enabled AroChem and its Board to better prevent Wells from using his position of director to injure and disrupt AroChem.

16. Wells and Buirkle determined to take whatever steps they could devise maliciously and in bad faith to interfere with the agreement between Victory and Harris. Thus, in mid-December 1989, Wells and Buirkle suggested that the Victory Companies and they enter into "settlement discussions." "The "settlement discus-

sions" were a mere pretext on the part of Wells and Buirkle. The real purpose of the discussions was to provide a forum for Wells and Buirkle to defame Harris and Arochem and by so defaming Harris and AroChem to interfere improperly with the November 1989 Agreement, and the contractual benefits it would confer on Harris and AroChem. Wells and Buirkle made the defamatory charges against Harris and AroChem knowing that the statements would prevent the Victory Companies from closing the agreement with Harris.

17. On or about December 20 and 21, 1989, Eric Johnson and S.L. Hutchison, on behalf of the Victory Companies, met with Wells and Buirkle. At the meeting, Wells and Buirkle made false and defamatory statements about Harris and AroChem. Wells and Buirkle accused Harris of engaging in criminal activity. Wells and Buirkle stated that Harris had engaged in the criminal activity that is also alleged in a complaint against Harris and AroChem filed by Wells in July 1989. They made further statements that went far beyond the outrageous allegations made in the complaint. They falsely and maliciously stated that Harris, with the help of other officers at AroChem, was embezzling AroChem funds, that Harris was "looting" AroChem's treasury for his own personal benefit, and that Harris was engaged in these criminal activities in conjunction with oil trading firms that were less than reputable. Wells and Buirkle also stated that Harris had "offshore" bank accounts in countries with which the United States has no extradition treaty, and that Harris was accumulating the funds he had stolen from AroChem in these accounts. Wells and Buirkle also stated that Harris would flee the jurisdiction of the United States courts within a year. At the meeting, Wells stated that these charges were based in part on information supplied by Buirkle, and Buirkle supported and confirmed Wells's charges of criminal wrongdoing by Harris.

18. Wells's and Buirkle's defamatory statements to E. Johnson and Hutchison were made with malice; Wells and Buirkle knew the statements were false or acted with reckless disregard as to the truth or

falsity of the statements. Wells and Buirkle made the statements to injure Harris and AroChem and to interfere with the Victory Companies' contractual and business relationship with AroChem and Harris.

19. Wells's and Buirkle's scheme succeeded. On or about January 11, 1990, the Victory Companies informed Harris and AroChem that, because of the allegations made by Wells and Buirkle, the Victory Companies would not close on the November 1989 Agreement. Although the Victory Companies requested substantiation for the charges, Wells and Buirkle refused to provide any substantiation.

20. The aforesaid conduct by Buirkle has caused and continues to cause injury to Harris and AroChem, including both general and special damages. As a direct consequence of Wells's and Buirkle's false statements, the agreement for the purpose of the Victory Companies' interest by Harris did not close. In addition, the credit of AroChem and Harris was diminished, the value and good will of AroChem was damaged, the business reputation of AroChem and the business and personal reputation of Harris were damaged, business opportunities were lost, and costs were incurred in responding to the accusations and in rehabilitating AroChem's and Harris's business reputation and good will.

Docket No. 34, exh. C, pp. 1–10.

Most of the remaining allegations of the complaint are legal characterizations of the claims against Buirkle. A few paragraphs of arguable relevance follow:

32. At various times relevant to these claims, AroChem obtained the use of $17.3 million in funds from Victory through various notes and financing agreements with Harris and AroChem. In addition, Harris entered into a Stock Purchase and Settlement Agreement with the Victory Companies, dated as of November 17, 1989, to which AroChem was a third party beneficiary.

33. By engaging in the conduct alleged above, Buirkle knowingly and intentionally interfered with the foregoing contractual relationships with the Victory Companies. The aforesaid actions were conducted through unlawful means, and were malicious and done solely for the purpose of injuring AroChem and Harris, without justification or excuse.

. . . . .

36. AroChem and Harris had, continue to have, and expect to develop additional business relationships with the Victory Companies.

37. By engaging in the conduct alleged above, Buirkle knowingly and intentionally interfered with the foregoing business relationships with the Victory Companies. The aforesaid actions were conducted through unlawful means, and were malicious and done solely for the purpose of injuring AroChem and Harris, without justification or excuse.

Docket No. 34, exh. C, pp. 13–14.

### FINAL JUDGMENT

By Interlocutory Order issued on August 12, 1993, this court gave the parties an opportunity to challenge any of the determinations of premise facts recited in the court's Opinion of that date. No submissions were filed.

In accordance with the findings and conclusions explained in the Opinion of August 12, 1993, no further submissions having been filed, the court hereby Orders:

Judgment for defendant, with costs.